# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 13-cv-1312 |
| TIMOTHY E. COOK, XYTOS, INC., and ASIA EQUITIES, INC., | ) ) ) ) | Jury Trial Demanded |
| Defendants. | ) ) ) | |

## COMPLAINT

The United States Securities and Exchange Commission alleges as follows:

### NATURE OF THE ACTION

1.       This case involves Timothy E. Cook's fraudulent scheme to sell shares in his purported biomedical company, Xytos, Inc. ("Xytos, Inc.").  Cook reaped over $500,000 in illicit profits from his scheme between 2010 and 2013.

2.       Xytos shares trade in the over-the-counter ("OTC") market.  They are not listed or traded on any exchange.

3.       Xytos is Cook's alter ego.  Cook is the company's chairman and CEO, and the only person who acts on its behalf.

4.       Cook owned over half of the outstanding tradable shares in Xytos at the outset of his scheme.  He owned those shares in the name of another alter ego entity, Asia Equities, Inc. ("Asia Equities").

5.     Cook portrayed Xytos to the investing public as an operational biomedical company.

6.     On the company's website, Cook created the impression that Xytos medical staff, overseen by a chief medical officer, treated cancer patients at the "Xytos Center for Advanced Medicine" in Indianapolis.  Cook bolstered that impression with Xytos financial statements he published on a popular OTC investor website.  Those statements listed revenue, significant assets, and a sizable cash balance.

7.     Cook's portrayal was a sham.  Xytos was—and still is—a company in name only.  It has no chief medical officer, medical staff, employees, treatment center, or facilities.  Xytos conducts no research and has no FDA approvals.  It generates no revenue and has nominal cash and assets.  Cook runs the company from his home.  He has no medical or scientific training.

8.     Cook personally profited from the sham. While falsely portraying Xytos to the investing public, Cook regularly sold his Xytos shares on the open market and lived off the proceeds.

9.     Between 2010 and March 2013, Cook sold more than three million Xytos shares on the open market, generating proceeds of over $400,000.  These proceeds were Cook's primary source of income.

10.    Cook also generated over $100,000 from private sales of Xytos shares to several investors.  Cook solicited these investors with misleading offering documents and then misappropriated their funds.

11.     Cook spent the misappropriated funds on personal entertainment, meals, clothing, and electronics.  During testimony before Commission staff, Cook claimed these were legitimate Xytos business expenses "[b]ecause I'm a part of Xytos."

12.     Cook then concealed his fraud from existing Xytos shareholders in a series of written shareholder updates.   These updates falsely assured investors that the company had auditors, outside legal counsel, and had secured additional financing.

13.     Cook's false assurances lulled Xytos shareholders into holding their shares. Meanwhile, Cook continued to dump his Xytos shares on the open market.

14.     By engaging in the conduct described above, Cook and Xytos violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)(1)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].  Cook aided and abetted Xytos's violations, and he is also liable for Xytos's violations as a control person.  Cook and Asia Equities violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## JURISDICTION AND VENUE

15.     The Commission brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §§ 77t(b) and 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)].

16.     This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].

17.      Venue is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)].  All of the defendants are inhabitants of, are found in, and transact business in the Southern District of Indiana, and many

of the acts and transactions constituting the violations alleged in this Complaint occurred within the Southern District of Indiana.

18.     Defendants, directly and indirectly, have made, and are making, use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts and transactions constituting the violations alleged herein.

## DEFENDANTS

19.     **Timothy E. Cook**, age 54, resides in Indianapolis, Indiana.

20.     **Xytos, Inc.** is a Nevada corporation based in Indianapolis, Indiana.  It purports to be a biomedical technology company.  Cook is Xytos's chairman and CEO.  Through Asia Equities, Cook is one of Xytos's principal shareholders.

21.     **Asia Equities, Inc.** is a Nevada corporation controlled by Cook.  It conducts no business and has no employees.  Asia Equities owns a large amount of outstanding Xytos shares.

## FACTS

### Xytos Is a Penny Stock Company

22.     Xytos is what is commonly referred to as a "penny stock" company.  Since 2009, shares of Xytos have traded at well below one dollar per share.

23.     Shares of Xytos are not listed or traded on any exchange.  They instead trade in the OTC market like many other penny stocks.

24.     Shares of Xytos trade in the OTC market operated by OTC Link LLC. ("OTC Link").  OTC Link is an electronic inter-dealer quotation system that displays quotes from brokers for many OTC securities.  OTC Link was formerly known as the Pink Sheets.

25.     OTC Link operates several OTC market tiers, each varying in the quality and quantity of information made available to investors.  Investors can access this information by visiting OTC Link's website.

26.     In March 2013 the Commission suspended trading in the shares of Xytos for ten business days because of a lack of current and accurate information about the company.

27.     As a result of the trading suspension, OTC Link ceased publishing dealer price quotes for Xytos shares.  OTC Link continues to publish other information about Xytos, including financial statements and other information Cook submitted to OTC Link from 2010 through 2012.

28.     Since the trading suspension, Xytos shares have sporadically traded on the so-called "Grey Market," the OTC Link market for securities that are not quoted by any dealers.

### Xytos Is Cook's Alter Ego

29.     Cook formed Xytos in 2004 and has controlled the company ever since.

30.     Since 2004, Cook has been the chairman and CEO of Xytos.  Since at least 2010, there have been no other Xytos officers or directors.

31.     Managing Xytos is purportedly a full-time job for Cook.  He does not work anywhere else.

32.     Cook has never drawn a salary from Xytos or received other compensation from the company.

33.     Cook controls Xytos's bank accounts.  Only Cook is authorized to deposit or withdraw funds from those accounts.

34.     Cook alone wrote Xytos press releases and communications to Xytos shareholders. He also prepared other materials made available to prospective Xytos investors.

35.     Cook is responsible for the content on the Xytos website, www.xytos.com.

36.     Cook prepared business models and financial projections for Xytos that he distributed to prospective investors.

37.     Cook published financial statements and other information about Xytos on the OTC Link website.

38.     Xytos is Cook's alter ego.  As a corporation, Xytos can only act through its officers, directors, or other agents.  Since at least 2010, Cook has been the only person acting in the name of Xytos.

### Cook Is a Principal Xytos Shareholder

39.     In or around 1999, Cook, through Asia Equities, acquired nearly 5 million (or over 30%) of the approximately 16 million outstanding shares in Xytos's predecessor company, ISM Holdings, Inc.  Cook changed the company's name to Xytos in 2004.

40.     Asia Equities is Cook's alter ego.  Since at least 2010, Cook has been the only person acting in the name of Asia Equities.  Cook is the beneficial owner of the Xytos shares owned by Asia Equities.

41.     By 2009, Cook owned more than half of the approximately 16 million outstanding unrestricted shares of Xytos.

42.     In 2009 and 2010, Cook deposited millions of Xytos shares into corporate brokerage accounts he opened at Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") and E*Trade Securities, LLC ("E*Trade"), respectively.  He opened those accounts in the name of Asia Equities.

43.     Cook did not deposit all of his Xytos shares into the brokerage accounts.  He continued to hold some shares in certificated form.

44.     Cook has sold many of his Xytos shares since 2009, but he still owns and controls a significant percentage of outstanding Xytos shares.

**Xytos Conducts No Business**

45.     Xytos conducts no business, biomedical or otherwise.

46.     Since at least 2010, Xytos has had no employees, officers, or directors other than Cook.  It has not sold any products or services, generated any revenue, treated any patients, or conducted any research.  It has no FDA approvals.

47.     Xytos has not had office space since 2008.  Cook runs the company from his home in Indianapolis.

48.     Xytos has no treatment center or other medical facilities.  It has nominal, if any, assets.  In testimony before Commission staff, Cook claimed that Xytos had some medical equipment stored in his home.

49.     Cook is not a doctor or scientist.  He has no training or education in biomedicine or biomedical technology.

**Cook's Fraudulent Scheme to Sell His Xytos Shares**

Falsely Portraying Xytos to Prospective Investors

50.     Since at least 2010, Cook has engaged in a multifaceted effort to falsely portray Xytos as an operational biomedical company specializing in advanced cancer diagnostics and treatment.

51.      Throughout this period, Cook published false and misleading statements about Xytos where potential investors would see them, including on the Xytos website, on the OTC Link website, and in at least one press release.

*The Xytos Website*

52.     Since at least 2010, Cook has caused various false and misleading statements to be published on the Xytos website, www.xytos.com.

53.     Cook directed potential investors to the Xytos website.  In or around 2011, Cook participated in a conference call with prospective or actual Xytos investors.  During the call, Cook directed prospective investors to the Xytos website to learn additional information about the company.

54.     The website's homepage contains photographs of a treatment center purportedly known as the "Xytos Center for Advanced Medicine" in Indianapolis.  The homepage invites visitors to "look inside" the center by clicking on various thumbnail photos purportedly depicting a "typical treatment room" and a typical "XyChloro absorption room."  The photos and accompanying descriptions have been on the website since at least 2010.

55.     In fact, Xytos does not have a treatment center, nor does it treat any patients. Since at least 2010, the website photos and their descriptions have created the false impression that Xytos treats patients at its own treatment center in Indianapolis.

56.     The existence of an operational Xytos treatment center would have been important to reasonable investors evaluating an investment in shares of Xytos.

57.     The website lists "John Trotter, M.D." as the company's chief medical officer and a member of the company's "Medical and Scientific Advisory Board."  It also contains a biography of Dr. Trotter under the heading "executive management team."   A May 2010 press release announcing Dr. Trotter's appointment as chief medical officer is also available in the website's "news" section.  These statements are false and misleading because Dr. Trotter has never worked for or received compensation from Xytos.

58.     In the accompanying press release, Cook highlighted the significance to Xytos of Dr. Trotter's purported hiring.  The release attributed the following quote to Cook:

> [W]e are truly excited to have Dr. Trotter as the Chief Medical
> Officer for the company. He is well versed in the protocols and

procedures that XYTOS uses in our Advanced Medical Techniques. He brings to the company access to a network of forward thinking Doctors and global contacts. Dr. Trotter will Train and Oversee the XYTOS Medical Staff as we introduce our Advanced Medical Techniques Globally. We have not made an announcement for a long period of time so this is a significant step towards getting the company back on track.

59.     Cook also mentioned Dr. Trotter's appointment in several private communications with investors and prospective investors, including in a conference call with investors and prospective investors in or around 2011.

60.     The appointment of a chief medical officer was important to investors evaluating an investment in shares of Xytos.  Cook's announcement of Dr. Trotter's appointment caused at least one investor to purchase shares in Xytos.

61.     Another investor with inoperable pancreatic cancer was impressed with Dr. Trotter's biography.  That investor purchased Xytos shares on the open market after Cook had announced Dr. Trotter's purported appointment as chief medical officer.  That investor was under the impression that Xytos was working on a possible treatment for his cancer.

62.     The website lists Edward Palmer as the only other Xytos director besides Cook. The website's biography for Palmer states that he "has extensive experience in debt and equity financing for public and private companies" and that "his background and global contacts has and will open a number of doors for XYTOS worldwide."  This statement was misleading because Palmer has been deceased for at least five years.

63.     The death of a Xytos director with extensive business experience and promising global contacts would have been important to investors evaluating an investment in shares of Xytos.

*OTC Link*

64.    From late 2010 through July 2012, Cook published false and misleading information about Xytos on the OTC Link website, which is accessible to the public at www.otcmarkets.com.

65.    The OTC Link website publishes quotes, news, financial reports, and other information about stocks traded in the OTC markets.  The website is popular with OTC investors.

66.    Cook periodically published unaudited Xytos financial statements on the OTC Link website.   Those statements, which Cook prepared himself, materially misrepresented the company's financial condition.

67.    In July 2012, Cook published a Xytos income statement listing a cash balance of $110,559 for the quarter ending March 31, 2012.  That amount was false and misleading because Xytos's bank accounts on March 31, 2012 contained only $2,657.

68.    The July 2012 income statement also listed $20,508 in revenue for the quarter ending March 31, 2012.  In fact, Xytos did not have any revenue—that is, income from business operations such as the sale of goods or services—in the second quarter or in any other quarter since at least 2010.

69.    Throughout 2011, Cook published several Xytos balance sheets on OTC Link showing cash balances of $102,236 as of March 31, 2011, $100,654 as of June 30, 2011, and $113,421 as of September 30, 2011.  Those amounts were false and misleading because Xytos's bank accounts as of those dates contained only $600, $6,470, and $171, respectively.

70.    Throughout 2011 and 2012, Cook published Xytos balance sheets on OTC Link listing over $2 million in property as a fixed asset.  That amount purportedly reflected the value

of an Australian property owned by Xytos.  That amount was false and misleading because Xytos has not owned or leased any Australian property since 2007.

71.     Xytos's financial condition, including its revenue, cash, and assets, would have been important to investors evaluating an investment in Xytos shares.

72.     Cook also published false and misleading general information about Xytos on OTC Link.  In or around October 2010, he updated Xytos's profile on OTC Link to indicate that the company had six employees when, in fact, it had none.

73.     Through his numerous misrepresentations on the Xytos and OTC Link websites, Cook created the illusion that Xytos, under the direction Dr. Trotter and oversight from an outside director, was an operational biomedical business treating cancer patients at its own facility.  Cook perpetuated that illusion with misleading financial statements listing property, revenue, and cash that did not exist.

<u>Cook Sold Shares on the Open Market</u>

74.     While falsely portraying Xytos to the investing public, Cook regularly sold his Xytos shares on the open OTC market.  He made these sales through the Asia Equities brokerage accounts at E*Trade and Merrill Lynch.

75.     Cook appears to have halted these sales in March 2013 after the Commission temporarily suspended trading in shares of Xytos.

76.     From January 2010 through March 2013, Cook sold nearly three million Xytos shares from the Asia Equities brokerage accounts.  Cook sold Xytos shares nearly every month during that period, and in most cases several times per month.  Cook reaped over $400,000 in proceeds from those sales.

77.     Cook lived off the proceeds from those sales. They were his primary source of income.

78.     No registration statement was filed or in effect for any of the transactions described above.

### Cook Hid His Xytos Affiliation from the Brokerage Firms

79.     Cook opened the Asia Equities brokerage accounts to hold and sell Xytos shares.  Since January 2010, he has sold no other securities from those accounts.

80.     When he opened the brokerage accounts at E*Trade and Merrill Lynch in 2010 and 2009, respectively, he immediately deposited shares of Xytos.  Nowhere on the E*Trade or Merrill Lynch account applications did he disclose any affiliation with Xytos.

81.     On the 2010 E*Trade application, Cook listed his occupation as CEO of Zeeot, Inc. ("Zeeot"), not Xytos, even though Cook testified before Commission staff that he has been working full time—60 or more hours a week—managing Xytos since at least early 2011.  On another 2010 application Cook filled out for OTC Link, he listed his position as CEO of Xytos.

82.     Zeeot is another of Cook's alter ego entities.  He alone controls the company, which conducts no business, generates no revenue, and has no employees.

83.     Brokerage firms often have heightened screening requirements for transactions in which company insiders or affiliates sell their own shares.  Shares in the hands of company insiders or affiliates are often considered "restricted" or "control" securities that may only be lawfully sold under certain conditions.

84.     Cook is a Xytos insider because he is the company's chairman and CEO.  Cook and Asia Equities are considered affiliates of Xytos under the federal securities laws because of Cook's common control of both Xytos and Asia Equities.

85.     On its website, E*Trade explains to account holders its policies for trading in restricted or control securities:

> Depending on the kind of security being sold (restricted or control) and who is selling it (an insider, affiliate, or non-affiliate), there are a variety of circumstances that may allow you to sell some or all of your restricted security holdings. Appropriate paperwork must be submitted prior to selling your restricted security.

86.     Cook knew that, as a director of Xytos, he could not freely trade Xytos shares on the open market.  In the summer of 2012, Cook told a Xytos investor that Cook could not make him a director of Xytos because doing so would bar that investor from trading Xytos shares in the open market.

87.     Cook omitted any reference to Xytos on the E*Trade account application to ensure that E*Trade would not restrict his ability to sell Xytos shares from the Asia Equities brokerage account.

88.     Cook's deceptive E*Trade application facilitated his fraudulent scheme to sell his Xytos shares.

<u>Cook Misappropriated Funds from Private Investors</u>

89.      While falsely portraying Xytos as an operational biomedical company, Cook solicited individual investors to purchase Xytos shares in private offerings.

90.     From 2010 through 2012, Cook offered and sold Xytos shares in private offerings to at least five investors.  Cook reaped over $100,000 from these offerings.

91.     Cook told investors that their investment would be used to fund Xytos's business.

92.     The investors purchased Xytos shares with personal checks payable to Xytos or wire transfers to Xytos's bank accounts.  Some investors purchased Xytos shares with personal

checks payable to Zeeot or wire transfers to Zeeot's bank accounts, which Cook also controlled. From 2010 through 2012, money from private offering investors was the largest source of deposits into Xytos's bank accounts.

93.     Cook withdrew money from Xytos's and Zeeot's bank accounts for personal expenses.  Those withdrawals drew on funds deposited by Xytos private offering investors. Cook did not tell those investors he was using their money for personal expenses.

94.     In 2011 and 2012, Cook withdrew at least $30,000 from Xytos's bank accounts for personal expenses unrelated to Xytos.   Those withdrawals included approximately $6,000 spent at fast food and other restaurants, $2,500 at various home improvement and consumer electronic stores, $2,000 on gas and auto repair, $1,800 at supermarkets and drug stores, $1,200 on clothing and entertainment, and $2,000 on a Florida vacation.   Cook also withdrew more than $15,000 from ATMs.

95.     Cook spent the money he withdrew from Xytos's bank account at businesses such as Cirque Du Soleil, GameStop, and the Reebok Store.

96.     In testimony before Commission staff, Cook claimed such expenses were legitimate Xytos business expenses "[b]ecause I'm a part of Xytos."

<u>Cook Used False and Misleading Offering Materials</u>

97.     Cook used at least two documents to solicit private offering investors.

98.     These materials included a Xytos business model and a stock purchase agreement ("SPA") between Xytos and the investor.

14

*Business Model*

99.     Cook prepared the Xytos business model.  He sent it to at least one private offering investor in or around 2011.  The business model contained numerous false and misleading statements about Xytos.

100.     The false and misleading statements in the business model portrayed Xytos as an operational biomedical company.

101.     The business model falsely claimed that a "patient's test history [is] reviewed by the Xytos medical staff."  In fact, there were neither Xytos patients nor medical staff.

102.     The business model falsely claimed Xytos had a "unique approval" from the FDA to do cancer diagnostics when in fact Xytos had received no FDA approval for any drug or biologic.

103.     The business model claimed that investor funds would be used "for our Medical Facility Expansion to allow us to increase the number of patients we can treat" when in fact Xytos had no existing medical facilities or patients.

104.     The business model did not indicate that Cook would use investor funds for personal expenses.

105.     The Xytos business model misrepresented facts that would have been important to investors evaluating an investment in shares of Xytos.

*SPAs*

106.     Cook also prepared the SPAs that he sent to Xytos private offerings investors. At least four such investors signed SPAs in 2011.  Cook countersigned those SPAs on behalf of Xytos.

15

107.     Each SPA purports to be an agreement between Xytos and each investor for the sale of Xytos common stock to the purchaser.

108.     The SPA deceived investors by making it appear that Xytos was privately offering shares it received from a third-party shareholder.   In fact, the shares Cook sold through the private offerings were his own.

109.     The SPAs concealed Cook's ownership interest in the shares purportedly being offered and sold by Xytos.

110.     The SPA's preamble states that Xytos "has received existing issued and outstanding shares, from an existing shareholder, to make this offering possible" and that "this offering is being made without the need to issue any new shares by the company."  This statement was misleading because Cook failed to disclose in the SPA that he was the "existing shareholder" who made the offering possible.  The statement that Xytos "received existing . . . shares, from an existing shareholder" was also false and misleading because Cook never transferred the shares he held in Asia Equities's name back to Xytos.

111.     In fact, the Xytos private offerings did not involve any Xytos shares owned by the company or a third-party shareholder.  They instead involved Cook reselling a portion of his own Xytos shares—shares he owned through Asia Equities—under the auspices of a Xytos private offering.

<u>Cook Lulled Shareholders with Additional Misrepresentations</u>

112.     In 2011 and 2012, Cook routinely sent written updates to Xytos shareholders. In several of these updates, Cook made additional misrepresentations about Xytos and its purported business.

16

113.     Those misrepresentations lulled shareholders into a false sense of security by claiming Xytos had retained auditors, legal counsel, and additional funding sources.

114.     Cook's false assurances kept existing investors from discovering they had invested in a sham company.

115.     In an October 3, 2011 shareholder update, Cook explained that he had received calls from shareholders about the stop sign icon that had recently appeared next to Xytos's quotation on the OTC Link website.

116.     According to OTC Link, a stop sign icon indicates that the quoted company does not provide disclosures and may not be making material information publicly available. The OTC Link website cautions that "companies that do not provide information to investors should be carefully researched before making any investment decision."

117.     In the October 3, 2011 update, Cook told shareholders that Xytos's "[a]uditors are working" on financial statements for the OTC Link website and that the stop sign "will be removed" after the financials are submitted.  That statement was false and misleading.  Xytos did not have any auditors.  Cook prepared all the unaudited Xytos financial statements he published on the OTC Link website.

118.     On October 17, 2011, Cook submitted Xytos financial statements he prepared to the OTC Link website.  OTC Link published the statements and removed the stop sign icon shortly thereafter.

119.     In a May 10, 2012 shareholder update, Cook attempted to explain to shareholders why months had passed since the last shareholder update, noting that he "received a number of calls and emails from shareholders simply asking the reason for the delays."

120.    Cook blamed the delay on "XYTOS legal counsel," which he claimed had not allowed him to release any information for several months because of an ongoing dispute with purported lenders over their possession of three million Xytos shares.  That statement was false and misleading because Xytos did not have any in-house or outside legal counsel.

121.    In the May 2012 update, Cook stated that the three million Xytos shares at issue in the dispute were provided to the lenders by "Major shareholders of XYTOS, that were interested in assisting with the growth of the company."  In fact, Cook, through Asia Equities, was the major shareholder who provided the shares to the purported lenders.

122.    In a November 9, 2012 shareholder update, Cook stated that Xytos had received another funding commitment that "will be announced publicly" and "further explained in an upcoming update to shareholders."  In fact, there was no additional funding commitment.

123.    Cook made these additional misrepresentations to existing shareholders to lull investors into holding their Xytos shares and to discourage them from selling.  Meanwhile, Cook continued to sell his own Xytos shares on the open market.

124.    Had Xytos shareholders sold in 2011 and 2012, they would have created downward pressure on Xytos's share price, thereby reducing the profit Cook could make selling his own Xytos shares.

125.    In his November 9, 2012 shareholder update, Cook explained that "Xytos understand [sic] that the shareholders want to move quickly" and that "Xytos wants the shareholders to understand that those shareholders that have held on and patiently allowed the company to put the necessary foundation in place for the company's future will be very happy that they remained a shareholder."

126.    Shareholders who held on to their Xytos shares based on Cook's misrepresentations are likely not very happy they remained a shareholder.  Since March 2013, the market for Xytos shares has all but evaporated, with sporadic trading occurring at nominal prices as low as a penny per share.

127.    Xytos shareholders invested in what appeared to be an operational biomedical company.  In reality, they invested in an illusion that Cook created and then exploited for personal gain.

## COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder (against Cook and Xytos)

128.    The Commission realleges and incorporates by reference paragraphs 1 through 127 as if fully set forth herein.

129.    Cook and Xytos, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly, used or employed devices, schemes, or artifices to defraud, and engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon other persons.  Further, Cook and Xytos made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

130.    Cook and Xytos knowingly or recklessly engaged in the fraudulent conduct described above.

131.    Through the conduct described above, Cook and Xytos violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT II

### Violations of Section 17(a)(1) of the Securities Act
### (against Cook and Xytos)

132.     The Commission realleges and incorporates by reference paragraphs 1 through 127 as if fully set forth herein.

133.     Cook and Xytos, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, employed devices, schemes or artifices to defraud.

134.     Cook and Xytos knowingly or recklessly engaged in the fraudulent conduct described above.

135.     Through the conduct described above, Cook and Xytos violated Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT III

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### (against Cook and Xytos)

136.     The Commission realleges and incorporates by reference paragraphs 1 through 127 as if fully set forth herein.

137.     Cook and Xytos, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

138.     Cook and Xytos knowingly, recklessly, or negligently engaged in the fraudulent conduct described above.

139.     Through the conduct described above, Cook and Xytos violated Sections 17(a)(2) and 17 (a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT IV

### Control Person Liability
### for Violations of Section 10(b) of the
### Exchange Act and Rule 10b-5 Thereunder
### (against Cook)

140.     The Commission realleges and incorporates by reference paragraphs 1 through 127 as if fully set forth herein.

141.     As alleged in Count I, Xytos violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

142.     At all times relevant to this Complaint, Cook controlled Xytos for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

143.     By reason of the foregoing, Cook is liable for Xytos's violations alleged in Count I as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

## COUNT V

### Aiding and Abetting
### Violations of Section 10(b) of the
### Exchange Act and Rule 10b-5 Thereunder
### (against Cook)

144.     The Commission realleges and incorporates by reference paragraphs 1 through 127 as if fully set forth herein.

145.     As alleged in Count I, Xytos violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

146.     Cook knowingly or recklessly provided substantial assistance to Xytos in connection with the violations alleged in Count I.

147.     Through the conduct described above, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Cook is liable for Xytos's violations alleged in Count I to the same extent as Xytos.

## COUNT VI

### Aiding and Abetting
### Violations of Section 17(a) of the Securities Act
### (against Cook)

148.     The Commission realleges and incorporates by reference paragraphs 1 through 127 as if fully set forth herein.

149.     As alleged in Counts II and III, Xytos violated Section 17(a) of the Securities Act.

150.     Cook knowingly or recklessly provided substantial assistance to Xytos in connection with the violations alleged in Counts II and III.

151.     Through the conduct described above, pursuant to Section 15(b) of the Securities Act [15 U.S.C. § 77o(b)], Cook is liable for Xytos's violations alleged in Counts II and III to the same extent as Xytos.

## COUNT VII

### Violations of Sections 5(a) and (c) of the Securities Act
### (against Cook and Asia Equities)

152.     The Commission realleges and incorporates by reference paragraphs 1 through 127 as if fully set forth herein.

153.     Cook and Asia Equities, directly or indirectly:  (i) made use of means or instruments of transportation or communication in interstate commerce or of the mails to sell,

through the use or medium of a prospectus or otherwise, securities as to which no registration statement was in effect; (ii) for the purpose of sale or delivery after sale, carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, securities as to which no registration statement was in effect; and (iii) made use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

154.    No valid registration statement was filed or was in effect with the Commission in connection with the sale by Cook and Asia Equities of Xytos common stock.

155.    Through the conduct described above, Cook and Asia Equities violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

A.      Find that Cook, Xytos, and Asia Equities committed the violations charged and alleged above;

B.      Enter an Order permanently enjoining and restraining:

> i.      Cook from violating, or aiding abetting violations of, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and from violating Section 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)];

> ii.     Xytos from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; and

> iii.    Asia Equities from violating Section 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

C.      Enter an Order requiring Cook, Xytos, and Asia Equities, jointly and severally, to disgorge all ill-gotten gains they have received as a result of the acts and conduct alleged herein, with prejudgment interest;

D.      Enter an Order, pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] requiring Cook, Xytos, and Asia Equities to pay civil penalties;

E.      Enter an Order, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], permanently prohibiting Cook from serving as officer or director of any issuer that has a class of securities registered

24

pursuant to Section 12 of the Exchange Act or that is required to file reports pursuant to Section 15(d) of the Exchange Act;

      F.     Enter an Order, pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)] and Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)], permanently prohibiting Cook from participating in an offering of penny stock;

      G.     Retain jurisdiction over this action, in accordance with the principles of equity and the Federal Rules of Civil Procedure, in order to implement and carry out the terms of all orders that may be entered or to entertain any suitable application or motion for additional relief, within the jurisdiction of this Court; and

      H.     Grant such other relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury on all issues so triable.

Dated:  August 19, 2013          Respectfully submitted,

                         s/ Nicholas J. Eichenseer
                         John Birkenheier  (BirkenheierJ@sec.gov)
                         Paul A. Montoya  (Montoyap@sec.gov)
                         Nicholas J. Eichenseer  (Eichenseern@sec.gov)
                         175 West Jackson Blvd., Suite 900
                         Chicago, IL  60604
                         (312) 353-7390
                         (312) 353-7398 (fax)

                         *Attorneys for Plaintiff*
                         *U.S. Securities and Exchange Commission*