UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) 1:13-cv-01312-SEB-MJD ) |
| TIMOTHY EDWARD COOK, XYTOS, INC. CLERK'S ENTRY OF DEFAULT ENTERED 10/8/2014, ASIA EQUITIES, INC. CLERK'S ENTRY OF DEFAULT ENTERED 10/8/2014, | ) ) ) ) ) ) |
| Defendants. | ) |

**ORDER ON PENDING MOTIONS FOR SUMMARY JUDGMENT,
DEFAULT JUDGMENT, AND TO DISMISS**

This matter is before us on three fully-briefed motions: (1) Plaintiff Security and Exchange Commission's ("SEC") Motion for Summary Judgment [Dkt. No. 59]; (2) Plaintiff SEC's unopposed Application for Final Judgment by Default as to Defendants Xytos, Inc. and Asia Equities, Inc. [Dkt. No. 63]; and (3) Defendant Timothy Cook's combined Rule 12(b)(6) Motion to Dismiss as to Count Seven (VII) of Plaintiff's Complaint and Motion for Summary Judgment [Dkt. No. 75]. For the following reasons, the SEC's Motion for Summary Judgment is GRANTED, the SEC's Application for Final Judgment by Default is GRANTED, and Mr. Cook's Motion to Dismiss and Motion for Summary Judgment is DENIED.

**INTRODUCTION**

The SEC has asserted claims against Timothy E. Cook related to his sale of Xytos, Inc. securities. Mr. Cook is the Chairman and CEO and Xytos. The SEC contends that Mr. Cook made misrepresentations about Xytos on its website, in press releases, and in "overviews" provided to investors, all of which violated the Securities Act of 1933. The SEC seeks disgorgement, civil

penalties, prejudgment interest, and injunctions in response to and as a remedy for Mr. Cook's conduct. Mr. Cook disputes all allegations against him, contends that Xytos was a legitimate business, and asserts that all his representations were truthful.

The lengthy timeline running through this litigation is significant. At certain times prior to 2008, Xytos acquired a medical facility, Xytos treated a single patient (for free), and Xytos collaborated with a single doctor. Beginning in approximately 2008, and thereafter, Xytos lost its medical facility, Xytos treated no patients, and Xytos had no medical professional with whom it was affiliated. These facts are not in dispute. The SEC alleges that, sometime after 2008, Mr. Cook made various misrepresentations on the Xytos website and in press releases, and sold shares of Xytos stock under false pretenses. This litigation ensued.

## PRELMINARY PROCEDURAL MATTERS

**SEC's Motion for Summary Judgment.**

The SEC has moved for summary judgment on its claims against Timothy E. Cook. Mr. Cook contends that the SEC has "abandon[ed] the original allegations [in its Complaint] and has listed different allegations in their Motion for Summary Judgment." [Dkt. No. 72 at 10.] Our review indicates this characterization by Mr. Cook is not accurate. In its 2013 Complaint, the SEC alleged that, since at least 2010, Mr. Cook knowingly made numerous material misrepresentations on the Xytos website, in at least one press release, and in materials distributed to investors. [Compl. at ¶¶ 50-51, 98-105.][1] It also alleged that Mr. Cook sold unregistered shares of Xytos

---

[1] Mr. Cook takes issue with the fact that between the filing of the Complaint and the filing of the motion for summary judgment, the SEC narrowed the time period at issue. Mr. Cook argues that the SEC "abandoned [its] original allegation" that Xytos was a company in name only choosing instead to focus on the time period after 2008. [Dkt. No. 74 at 9.] This kind of winnowing to include only viable claims is actually welcomed by the Court; it should not be curtailed by a strict adherence to the limited nature of notice pleading. Moreover, Mr. Cook's objection holds no sway in convincing us that Xytos was a viable medical company after 2008.

stock. [*Id.* at ¶ 78.] Mirroring the allegations in the Complaint, the SEC's motion for summary judgment also asserts that from 2009 to 2012, Mr. Cook knowingly made numerous material misrepresentations about Xytos on the company's website, in press releases, and in an investor prospectus, and that he sold unregistered shares of Xytos. [Dkt. No. 60 at 1-2.] The SEC's motion for summary judgment seeks judgment in its favor on the claims it has asserted in the Complaint. Mr. Cook's argument that the SEC's motion for summary judgment abandons claims and makes different allegations demonstrates a misunderstanding of the purpose of notice pleading under Federal Rule of Civil Procedure 8 – that the details of the claim are to be fleshed out through the course of litigation and that the discovery process is meant to more thoroughly examine the facts. We find that the SEC's Motion for Summary Judgment squares with its Complaint and that there is nothing untoward about the way in which the motion has been framed.

On February 27, 2015, in response to the SEC's Motion for Summary Judgment reply brief, Mr. Cook filed a 44-page surreply. [Dkt. No. 74.] As provided in Southern District of Indiana Rule 56-1(d), surreplies are appropriate *only* to address new evidence or to respond to the moving party's objection to the responding party's evidence. Neither of these two justifications for a surreply exists here. In addition, Local Rule 7-1(e)(1) limits Reply briefs to 20 pages. Mr. Cook's surreply exceeds the page limit by more than double. More critically, Mr. Cook's surreply adds nothing to the discussion of the issues on summary judgment. Indeed, Mr. Cook's opening paragraph of his Surreply describes the SEC's reply as "simply a restatement" of its opening brief, and states that he has "responded to these allegations" in his previously-filed response. [Dkt. No. 74 at 6.] Mr. Cook seeks to persuade the Court that genuine issues of material fact exist by attempting to refute line-by-line the headings and arguments of the SEC in the motion for summary judgment, as opposed to the factual basis for the claims. We have given careful consideration to

Mr. Cook's arguments, but still must hold him to the applicable procedural rules.  *See Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) ("[R]ules apply to uncounseled litigants and must be enforced.").

Mr. Cook also filed his response to the SEC's Motion for Summary Judgment on behalf of Asia Equities, Inc. and Xytos, Inc.  Both of these defendants were defaulted on October 8, 2014, and those defaults have not been set aside.  Moreover, these entities are not represented by counsel and cannot be represented by Mr. Cook, a non-attorney.  Mr. Cook's responses on behalf of Asia Equities, Inc. and Xytos, Inc. will thus be disregarded.

**Mr. Cook's Motion to Dismiss and Motion for Summary Judgment.**

Long after the deadline passed for filing dispositive motions [*see* Dkt. No. 18 at 5 (setting December 8, 2014 as the dispositive motion deadline)], Mr. Cook filed on March 2, 2015 a Motion to Dismiss and Motion for Summary Judgment as to the SEC's Count VII, which alleges violations of Sections 5(a) and 5(c) of the Securities Act of 1933 (failure to register the securities).  Mr. Cook's motion repeats defenses to this claim he asserted in response to the SEC's motion for summary judgment.  [*See generally* Dkt. No. 75.]  In fact, Mr. Cook borrows arguments made by the SEC in its Motion for Summary Judgment.  [*Id*. at 7-8.]  As noted above, pro se litigants are bound by the same rules as those represented by counsel.  Mr. Cook's belated motion is denied for all of the substantive reasons stated herein and in addition based on its untimely and duplicative nature.

**The SEC's Application for Final Judgment by Default.**

On December 19, 2014, the SEC moved for final judgment by default as to Defendants Xytos, Inc. and Asia Equities, Inc., against whom default was entered on October 8, 2014.  No party objected to the application for entry of final judgment.  Accordingly, with the exception of

allegations related to damages, the factual allegations of the Complaint against Asia Equities and Xytos are accepted as true, and, as is further explained herein, the SEC's application is granted. *E360 Insight v. Spamhaus Project*, 500 F.3d 594, 602 (7th Cir. 2007) ("A default establishes, as a matter of law, the defendants are liable to plaintiff on each cause of action alleged in the complaint.") (citations omitted).

## BACKGROUND AND MATERIAL FACST

The SEC sets forth in copious fashion the factual basis of its Motion for Summary Judgment. In response, Mr. Cook has filed a confusing amalgamation of facts and arguments. Although Mr. Cook has presented an array of background facts and embellishments of facts presented by the SEC, these facts fall decidedly short of creating a genuine issue that would foreclose summary judgment.

**A**    **Mr. Cook's History of Corporate Investment.[2]**

In the mid-1990s, Mr. Cook owned a company called Suisse Capital. [Deposition of Timothy E. Cook ("Cook Dep.") at 20.] Through Suisse Capital, Mr. Cook invested his and others' money in ten to twenty public companies. [*Id.* at 19-21.] Mr. Cook ceased doing business through Suisse Capital in the early 2000s because the company had lost all the money it invested. [*Id.* at

---

[2] Mr. Cook disputes the accuracy of several of the SEC's headings in its brief. For example, Mr. Cook disputes the SEC's contention that "Cook Invested His and Others' Money in an Insolvent Race Car Company" [Dkt. 60 at 2] and that "Cook Tried But Failed to Develop Medical Businesses for Xytos" [*id.* at 4]. [Dkt. No. 72 at 15; *see also id.* at 18 (disputing the headings "Cook did not disclose his affiliation with Xytos to the Brokerage Firms," "Between 2009 and 2012, Cook Sold 4,813,109 Xytos Shares for $503,513," and "Cook Made at Least $100,000 through Private Placements of Xytos Stock"); *id.* at 19 (disputing "Cook Was Responsible for the Content on the Xytos Website").] The SEC's argumentative headings in its Statement of Material Facts Not in Dispute are not facts themselves, but rather apparently a tool to facilitate the organization of the SEC's factual explication. Without evidentiary support, these headings do not constitute admissible facts that impact the outcome of the summary judgment motion. The same is true for Mr. Cook's objections to the SEC headings – without evidentiary support, Mr. Cook's allegedly disputed facts are inadmissible and, more to the point, irrelevant.

20, 24.]  Asia Equities, Inc. ("Asia Equities") was the holding company through which Mr. Cook made the Suisse Capital investments.  [*Id.* at 37.]

In 1998, through Asia Equities, Mr. Cook invested approximately $1 million in a company called ISM Holding Corp.  [*Id.* at 26; Dkt. Nos. 60-4 and 60-5 (Mr. Cook's Jan. 10, 2015 Testimony at  SEC hearing ("Cook Test.")) at 117-18.]  Most of that $1 million came from other investors.  [*Id.* at 26, 41, 93.]  ISM was a sports management company that purportedly owned and operated race car teams.  [Dkt. No. 62-16 (ISM Holding Corp Form 10-KSB ("ISM 10-KSB")) at 3; Cook Dep. at 66, 71.]  In exchange for its investment, Asia Equities received millions of shares of ISM stock.  [ISM 10-KSB at 5.]

After the investment in ISM failed, Mr. Cook "discovered" in 1999 or 2000 that ISM's liabilities greatly exceeded its assets.  [Cook Dep. at 73.]  Mr. Cook believed ISM management had misrepresented the company's assets and liabilities in connection with that investment.  [*Id.* at 25, 73.]

**B.     The Beginning of Xytos and Its Medical Focus.**

**1.     The Formation of Xytos, Inc.**

In the early 2000s, Mr. Cook took over ISM in an attempt to recover the money he had previously invested in the company and facilitate an acquisition of ISM by Global Access, a telecommunications company.  [Cook Dep. at 24-27, 67, 72-73; Cook Test. 119-20.]  Global Access pulled out of the deal after being sued by ISM's creditors.  [Cook Dep. at 25-26, 67, 72-73; Cook Test. 119-20.]

In 2004, Mr. Cook changed ISM's name to "Xytos, Inc." and announced that it was a medical company.  [Cook Dep. at 66-68; Dkt. No. 62-24 (Xytos, Inc. Business Entity Information).]  The millions of ISM shares Asia Equities held thus became shares in Xytos.  [Cook

Dep. at 40; Cook Test. at 120-21.]  Mr. Cook has been the CEO of Xytos since 2004.  [Cook Dep. at 32.]  He has also been the lone director of Asia Equities since 2004.  [*Id.* at 37, 40; Cook Test. at 111-12.]  Since becoming CEO of Xytos, Mr. Cook has never been paid a salary or other compensation by Xytos, nor was he employed elsewhere.  [Cook Dep. at 27-28.]

Mr. Cook, personally, has no medical training.  [*Id*. at 11.]  When he changed ISM's name to Xytos in 2004, he also had no scientific training outside of his affiliation with companies relating to Xytos.  [*Id.* at 13.]  Mr. Cook earned a business degree from Marian College in the 1990s and has no additional formal education.  [*Id.* at 11.]

After changing ISM's name to Xytos, Mr. Cook began looking for a novel technology that Xytos could commercialize.  [*Id.* at 77.]  In or around 2004, he pursued technologies relating to hair and teeth regeneration as well as the treatment of brain hemorrhaging.  [*Id.* at 77, 89, 103.]  Xytos was never able to commercialize any of those technologies.  [*Id.* at 99, 100-01.]

## 2.      Xytos's Focus on Cancer Treatments.

Also in approximately 2004, Mr. Cook turned his attention to technologies for cancer treatments.  In this regard, Mr. Cook began discussions with Dr. Thomas Cleary, a physician in Australia.  [*Id.* at 108.]  Dr. Cleary worked at a clinic in Melbourne, Australia, where he allegedly treated cancer patients using photodynamic or "light" therapy.  [*Id.* at 107-08, 115.]  As part of this therapy, a synthesizer – a chlorophyll powder mixed with distilled water – was dropped under the patient's tongue.  [*Id.* at 112-14.]  According to Mr. Cook, after three days the synthesizer would attach itself only to cancer cells.  At that point, a device that emitted laser or other light or sound waves would activate the synthesizer, killing those cancer cells that were close to the surface of the body, such as on the skin, prostate, or breast.  [*Id.* at 112, 114.]

Mr. Cook reached a business agreement with Dr. Cleary around 2004, under which Xytos agreed to open a new clinic in Australia for Dr. Cleary.  [*Id.* at 106-07, 109.]  Dr. Cleary, in turn, agreed to treat his existing cancer patients at the new Xytos clinic.  [*Id.* at 107.]  But Xytos never opened a clinic or any other facility in Australia, nor did it ever treat any patients or generate any revenue in Australia.  [*Id.* at 118-19.]  Dr. Cleary came to the United States to work for Xytos sometime around 2006.  [*Id.* at 146-47.]  Dr. Clearly left for Ireland around Christmas of 2006 or 2007 and never returned to Indianapolis.  [*Id.* at 146-47.]  Mr. Cook believes that Dr. Cleary has since died.  [*Id.* at 174.]

### 3. Xytos Treatment of Cancer Patients in the United States.

In approximately 2006, Mr. Cook and Dr. Cleary agreed that Dr. Cleary would come to the United States to treat patients using photodynamic therapy at a new Xytos clinic that Mr. Cook planned to open in Indianapolis.  [*Id.* at 120-21.]  Dr. Cleary also agreed to train doctors at other clinics Xytos planned to open around the world.  [*Id.* at 120-21.]

In 2006, Mr. Cook attempted to secure approval from the Medical Licensing Board of Indiana ("MLBI") for Xytos to treat cancer patients in Indiana using photodynamic therapy.  [*Id.* at 130; Dkt. No. 62-5 (May 3, 2006 letter from Mr. Cook to "Rick") at 1.]  Mr. Cook attempted to secure approval under an Indiana statute (Ind. Code. § 25-22.5-1-2.1) that allows Indiana-licensed physicians to conduct "experimental or nonconventional treatment" outside of a hospital setting, provided the MLBI develops protocols for such treatment.  [Dkt. No. 62-3 (July 5, 2006 letter from Medical Licensing Board of Indiana ("MLBI") to Xytos's attorney); Dkt. No. 62-6 (Xytos's

submission to the MLBI) at 72.]³  Through its attorney, Xytos submitted its treatment protocols to the MLBI in May 2006.  [Dkt. No. 62-2 (letter from Xytos's counsel to the MLBI) at 2.]

In a July 5, 2006 letter to Xytos's attorney, the MLBI responded to Xytos's submission by requesting that Xytos comply with one of the following conditions concerning its cancer treatment: (1) establish a relationship with a hospital investigation review board, (2) establish a relationship with an independent investigation review board, or (3) have its facility accredited by one of three nationally recognized accreditation bodies.  [*Id.* at 1; Dkt. No. 62-3 (MLBI letter to Xytos).]  Mr. Cook received the letter on or about the day it was sent, July 5, 2006.  [Cook Dep. at 133.]

Xytos never complied with the MLBI's 2006 request.  [Dkt. No. 61-10 (MLBI Jan. 28, 2010 Meeting Minutes) at 9.]  Xytos never established a relationship with an investigative review board, nor was it ever accredited.  [Cook Dep. at 137, 138.]  Sometime later in 2006, Mr. Cook contacted a nationally-recognized accrediting body, the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO").  [*Id.* at 134; Dkt. No. 62-26 (Declaration of Chad Larson ("Larson Decl.")) at ¶ 5.]⁴  According to Mr. Cook, JCAHO referred Xytos to Primary Resources

---

³ Mr. Cook argues that this fact is disputed because he maintains that Indiana Code § 25-22.5-1-2.1 does not contain the word "approval" and that Xytos therefore did not need approval to perform Xytos's treatments.  [Dkt. No. 72 at 15-16.]  Mr. Cook further explains that the Xytos technology was new to the MLBI and, as a result, the Board was unable to establish protocols for that technology.  [*Id.* at 16.]  Mr. Cook's position with respect to these SEC-asserted facts is argument, not evidence of competing facts.  Mr. Cook obviously is attempting to establish that Xytos did not need MLBI approval to perform its treatments.  The facts set forth by the SEC above repeat Xytos's lawyer's letter, that "it attached hereto, for the Board's review, comments, changes *and/or approval*, the XYTOS protocols . . . ."  [Dkt. No. 62-2 at 2 (emphasis added).]  Even if Xytos believed it did not *need* MLBI approval, it is undisputed that Xytos *sought* approval from the MLBI.

⁴ Mr. Larson is the Accreditation Manager for Service Teams for the Ambulatory Health Care program at the Joint Commission, formerly known (until 2007) as the Joint Commission on Accreditation of Healthcare Organizations.  [Larson Decl. at ¶ 1.]  Mr. Larson's duties with the Joint Commission include management of initial and reservey activity for ambulatory organizations.  [*Id.*]

in Florida to assist with accreditation, and Xytos paid Primary Resources $4,350 to assist with

Xytos's accreditation with JCAHO.  [Dkt. No. 61-5 (Xytos's bank statements); Dkt. No. 61-9

(Zeeot bank statements)[5].]   JCAHO never conducted a survey of Xytos and, as such, never

accredited Xytos.  [Larson Decl. at ¶ 5.]  Mr. Cook acknowledged in a March 2008 letter that

Xytos had not received full approval from the MLBI.  [Dkt. No. 62-4 (letter from Mr. Cook to

Maura Hoff related to lease payment).]   In 2010, the MLBI acknowledged that it had never

approved Xytos's "XyChloro" photodynamic treatment.  [Dkt. No. 61-10 (MLBI Jan. 20, 2010

Meeting Minutes at 9).][6]

Additionally, Xytos never received any FDA approvals, nor did it seek any.  [Dkt. No. 62-

14 (Def. Req. for Admissions Resp.) at 2; Cook Dep. at 158; Cook. Test. at 72.]  Xytos also never

received any regulatory approvals in Iceland.  [Cook Dep. at 101-02.]

Before June 2006, Xytos maintained no facility to treat patients in the United States or

anywhere else.  [*See* Cook Dep. at 174, 181.]  In May 2006, Mr. Cook signed a lease on behalf of

Xytos to rent a medical suite located in a commercial building located at 8330 Naab Road in

Indianapolis.  [Declaration of Robert L. Titzer ("Titzer Dep.") at ¶¶ 2-3.][7]  The lease term was

June 1, 2006 through November 30, 2009.  [*Id.* ¶ 4.]

---

[5] Since 2003, Mr. Cook has owned a company called Zeeot, Inc.  [Cook Dep. at 33-34.]
Mr. Cook describes Zeeot as an alternative energy company, but it has not conducted any business
or generated any revenues under Mr. Cook's ownership, and Zeeot has never been a full-time
endeavor for Mr. Cook.  [*Id.* at 34; Cook. Test. at 114-15.]

[6] Mr. Cook disputes this fact as presented by the SEC again because he asserts Indiana
Code § 25-22.5-1-2.4 does not require approval from the MLBI.  [*See* Dkt. No. 72 at 17.]
However, this legal argument does not place in dispute the fact asserted by the SEC that the MLBI
did not approve Xytos's XyChloro photodynamic treatment.

[7] Mr. Titzer is the Executive Vice President for HAS Commercial Real Estate who owned
and managed the commercial office building located at 8330 Naab Road in Indianapolis.  [Titzer
Decl. at ¶¶ 1-2.]

During the time in which Dr. Cleary visited the United States, he allegedly treated one patient for Xytos.  [*See* Dkt. No. 62-13 (Def. Interrog. Resp.) at ¶¶ 13, 16; Cook Dep. at 147, 193-94.]  That patient, whom Dr. Cleary knew before becoming associated with Xytos, did not pay a fee for the alleged treatment.  [Def. Interrog. Resp. at ¶ 16; Cook Dep. at 147, 190.]  Mr. Cook knew in advance the patient would not be paying for the treatment because it "was just a training session."  [Cook Dep. at 147.]

The one patient Dr. Cleary "treated" in 2006 or 2007 was the first and only patient Xytos ever treated.  [Def. Interrog. Resp. at ¶ 13; Cook Dep. at 147, 183, 189-90, 193-94, 210, 244.]  Xytos never treated any other patients, nor did it ever generate any revenue from treating patients.  [Cook Dep. at 129; Def. Interrog. Resp. at ¶ 16.]

Xytos stopped paying rent on the Naab Road suite as of January 2008.  [Titzer Decl. at ¶ 5; Cook Dep. at 170.]  Mr. Cook testified that he stopped paying rent because Xytos "[d]idn't have any money to pay" and because the hoped-for revenue from treating patients "wasn't forthcoming."  [Cook Dep. at 170.][8]  Thereafter, Mr. Cook and Xytos did not have access to the rented premises.  [Titzer Decl. at ¶ 11.]  Mr. Cook stated in letters to the leasing agent in April and May 2008 that Xytos had not ever used the Naab Road suite.  [*Id.* ¶¶ 6-7; Dkt. No. 62-4 (Mar. 25, 2008 letter from Mr. Cook to Maura Hoff regarding lease) ("[T]o date XYTOS has been unable to use the space at Naab Road . . . .").]

---

[8] In late 2008, the leasing agent obtained an order of possession and judgment in Indiana state court against Mr. Cook and Xytos for $73,572.59 to cover back rent and other fees.  [Titzer Decl. at ¶¶ 9-10.]  To date, neither Mr. Cook nor Xytos has paid any of the outstanding judgment.  [*Id.* at ¶ 9.]

**C.      Xytos Investors and Stock Sales.**

**1.      Xytos Investors from 2004-2012.**

From 2004 to 2012, shares of Xytos were continuously quoted and traded on the public over-the-counter stock market known as the "pink sheets." [*See* Cook Dep. at 89, 120, 125.] During this period, investors purchased shares of Xytos on the open market. [*See id.* at 125, 219.] Mr. Cook believed Xytos was a good investment because the company had access to novel technology that "wasn't readily available in the world." [*Id.* at 18-23.] Mr. Cook's compensation did not include any stock or other remuneration, though his wife purchased "several hundred thousand shares of Xytos stock in the open market." [Dkt. No. 72 at 17-18 (citing Dkt. No. 61-11 (May 26, 2010 Xytos press release regarding new Chief Medical Officer)); Cook. Test. at 27-28.] Mr. Cook thought the share price would go up as Xytos began to reap revenues from treating patients with its novel cancer and hair/teeth technologies. [Cook Dep. at 128.] Mr. Cook produced to the SEC a Xytos shareholder registry dated as of February 2009 that listed 58 separate shareholders. [Dkt. No. 62-7 (Xytos shareholder registry).]

**2.      Mr. Cook's 2009 Asia Equities Accounts with Merrill Lynch and E*Trade.**

In 2008 or 2009, Mr. Cook began running out of funds. [Cook Test. at 121.] In 2009, he opened a brokerage account in the name of Asia Equities at Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"). [Cook Dep. at 222.] Into that account he deposited more than 3 million Xytos shares held by Asia Equities. [*Id.* at 231; Dkt. No. 62-17 (Asia Equities statement) at 3.] Mr. Cook began selling the shares in the Merrill Lynch account to pay his personal expenses and "help support [Xytos]." [Cook Dep. at 224.]

In August 2011, Mr. Cook opened another brokerage account at E*Trade Securities LLC ("E*Trade") in the name of Asia Equities [*id.* at 231; Dkt. No. 60-12 (E*Trade opening documents

for Asia Equities)] into which he transferred the roughly 2 million Xytos shares remaining in the Merrill Lynch account.  [Dkt. No. 62-19 (E*Trade statement) at 5.]  When Mr. Cook opened the E*Trade account, he signed his wife's name on what purported to be Asia Equities' corporate resolution authorizing Cook to open and place trades in that account.  [Cook Test. at 127; Dkt. No. 60-12 at 7.]

Mr. Cook testified that, as CEO of Xytos from 2004 to the present, he considered himself to be an officer of a public company.  [Cook Test. at 116; *see* Cook Dep. at 66, 13-15, 86-87.] Both the Merrill Lynch and E*Trade account applications that Mr. Cook signed asked the applicant whether he was an officer or director of a public company.  [Cook Test. at 116; Dkt. No. 60-12 (E*Trade opening documents); Dkt. No. 62-18 (Merrill Lynch application) at 3-4.]  Mr. Cook did not mention Xytos on either application, nor did he disclose that he was a director or officer of a public company.  [Cook Dep. at 252; Cook Test. at 116; Dkt. No. 60-12 at 2; Dkt. No. 62-18 at 3-4.]  In or around 2011, Mr. Cook told one investor (Gerald Wojtan) that, under SEC rules, an investor would not be able to lawfully sell his Xytos shares if the investor became a director of Xytos.  [Deposition of Gerard Wojtan at 71.]  In or around 2012, Mr. Cook also told Mr. Wojtan that he (Mr. Cook) was "just a CEO of Xytos" and "didn't own one share" of the company.  [*Id.* at 41-42.]

From January 2009 through December 2012, Mr. Cook sold a total of 4,813,109 shares of Xytos on the open market from the Asia Equities' brokerage accounts.  [Dkt. No. 67 (Table A to Declaration of Norman H. Jones, Staff Accountant with the Enforcement Division of the SEC); *see* Cook Dep. at 225.]  The total proceeds from those sales was $503,513.  [Ex. 8 Table A.]  Mr. Cook sold shares of Xytos on 290 separate occasions during that period and failed to file any registration statement with the SEC relating to any of those sales.  [Cook Dep. at 251; Ex. 45 (SEC

Records Custodian Attestation) at 41; Ex. 8 Table A.]  Mr. Cook notes that the shares of Xytos that were sold between 2009 and 2012 were owned by Asia Equities, Inc. and, though not owned by Mr. Cook, he controlled the Asia Equities brokerage accounts and he personally authorized the sales and he personally withdrew the sales proceeds.  [Dkt. No. 72 at 18; Dkt. No. 73 at 8 (citing Cook Dep. at 111, 128, 231).]  Mr. Cook used the proceeds from those sales to support his personal needs.  [Cook Test. at 141, 190, 213.]

In applying the proceeds from his open-market Xytos sales to finance his personal expenses, Mr. Cook, for example, in April 2010, used funds from his Merrill Lynch brokerage account to make payments to DirecTV, a pool supply store, Pizza Hut, and his home equity lender, among other payees.  [Cook Dep. at 224-30, 231, 233.]

Mr. Cook also used some of the money he raised from private placement investors to pay his personal expenses.  [Cook Test. at 186, 197-98; Dkt. No. 61-8 (Xytos bank statements).]  For example, shortly after one Xytos private placement investor wired $25,000 into the Xytos bank account, Mr. Cook used a debit card linked to that account to make purchases at Benihana, Kroger, the Reebok Store, and McDonald's.  [Cook Test. at 196-97; Dkt. No. 61-8 (Xytos bank statement) at 9-10, 15-16.]  Mr. Cook had told individual investors he would use their money for Xytos's business in Germany.  [Cook Test. at 141, 188.]  One investor testified that he would have been "furious" if he had known Mr. Cook spent investor funds on personal expenses.  [Wojtan Dep. at 111-12.]

Mr. Cook attempts to dispute the SEC's version of these facts.  He first claims that the proceeds of Xytos, Inc. stock sales were used for Xytos International, citing a document titled "XYTOS Use of the 100K in investors [sic] Funds [Extracted from XYTSO Bank Account]."  [Dkt. No. 72-5.]  However, this document does not support Mr. Cook's contention.  In fact, the

14

document at Docket Number 72-5 does not mention Xytos International, Inc.  Mr. Cook fails to explain how Docket Number 72-5 supports his claim in any way, and also has omitted any attempt to authenticate it.

Mr. Cook next claims that his employment contract with Xytos provided that he "had the right to use funds for personal expenses, if he chose to do so."  [Dkt. No. 72 at 19.]  To the extent this claim is premised on Defendant's Exhibit 16, it is an inaccurate summary of that document [Dkt. No. 72-16].  This excerpt of Mr. Cook's employment contract [Def. Ex. 16] does not grant carte blanche authority to Mr. Cook to use company funds for personal expense, as he claims.

Finally, Mr. Cook's statement that "Xytos Bank Statements will be shown to a jury in court clearly showing other funds deposited to the Xytos bank account and clearly showing the use of said funds" does not create a genuine issue of material fact capable of defeating summary judgment.  Mr. Cook has presented no evidence to support his statements in these respects or to contradict the SEC's averments.

### 3.    Private Placement of Xytos Stock.

In 2010 and 2011, Mr. Cook sold Xytos, Inc. shares to several investors via private transactions.  [Dkt. No. 60 at 9 (citing *e.g.*, Dkt. No. 62-13 (Pltf. Interrog. Resp.) at ¶ 3; Dkt. No. 61-12 (Confidential Memo) at 4-5; Dkt. No. 62-20 (Xytos, Inc. purchase agreement for 100,000 shares for the purchase price of $25,000); Dkt. No. 62-22 (Xytos, Inc. purchase agreements).]  As a result of these sales, Mr. Cook raised at least $100,000 from these investors.  [Dkt. No. 60 at 9 (citing Dkt. No. 62-13 (Pltf. Interrog. Resp.) at ¶ 3; Dkt. No. 61-12 (Conf. Memo) at 4-5).]  Mr. Cook deposited these funds into Xytos and Zeeot bank accounts, which he alone controlled.  [Cook Test. at 183-84, 196-97, 231.]

### D.      Xytos Public Communications.

#### 1.      The Xytos Website.

The Xytos website which Mr. Cook helped create in or around 2005 is rife with inaccuracies and misleading information.  [Cook Dep. at 42.]  Mr. Cook has testified that he himself created the website's non-medical content, including information about the company's directors and statements from management.  [*Id.* at 50.]  Mr. Cook claims that Dr. Cleary produced the website's medical content, though Mr. Cook reviewed before it was posted to the website.  [*Id.* at 49.]  Mr. Cook also transmitted the Cleary-produced medical content to the website's administrator for publication.  [*Id.* at 49.]  After Dr. Cleary disengaged from Xytos in 2006 or 2007, Mr. Cook was solely responsible for the content and maintenance of the website, with authority to add, update, and remove any and all content.  [*Id.* at 50, 51-52; Cook Test. at 34.][9] Specifically, Mr. Cook testified:

Q: Who's responsible for the content that appears on Xytos's website?

A: I'm responsible for the content along with the doctor that helped me put that together.

Q: Which doctor are you referring to?

A: Thomas Cleary.

Q: Are you responsible for updating the information that's contained on the Xytos website?

A: Yes

---

[9] Mr. Cook notes that no changes were made to the Xytos website during the period in question [Dkt. No. 72 at 20]; however, the fact that no changes were made to the website does not contradict the fact that Mr. Cook had the *authority* and ability to add or remove content from the website.

[Cook Dep. at 34.][10]

Between 2009 and 2012, the period during which Mr. Cook sold Xytos shares, he routinely encouraged investors and others to visit the Xytos website.  [Dkt. No. 60 at 11 (citing Cook Dep. at 253-55; Ex. 22 at 1; Ex. 29 at 1 ("A more complete overview of XYTOS can be reviewed at www.xytos.com."); Ex. 27 at 1; Ex. 7 ¶ 3; Ex. 39 at 1); *see also* Dkt. No. 62-9 (Jan. 27, 2011 press release stating "our patient results are to [sic] extensive to post here but additional results for Breast, Skin, and Prostate Cancer Patients are available for review on the SYTOS website at www.xytos.com.").]  Between 2010 and 2013, investors visited the Xytos website (which was in existence from 2005 through at least 2013) and relied on the information contained there when making investment decisions.  [*E.g.*, Dkt. No. 60-8 (Declaration of Jude Mullen ("Mullen Decl.") at ¶ 5; Cook Dep. at 42, 50-51; Dkt. No. 60-9 (SEC Decl. authenticating Xytos website images).][11]

The Xytos website consisted of several subsections each relating to an aspect of the Xytos business and medical technology; all were in some fashion inaccurate, misleading, and/or false. We review each of these subsections below:

**"Patient Results."**  Xytos did not treat any patients in 2008 or 2009.  [Cook Dep. at 211.] However, the Xytos website featured a section titled "Patient Results," which was intended to

---

[10] Mr. Cook claims that the Xytos website was built by a website developer, Home on the World Wide Web ("HOW"), and that HOW made changes to the website.  [Dkt. No. 72 at 30.] This statement, even if true, does not create a genuine issue of material fact.  Mr. Cook testified that HOW provided technical assistance to Mr. Cook, but did not provide any of the website's content.  [Cook Dep. at 47-48.]  There is no evidence showing that HOW was responsible for content changes to the Xytos website.   In any event, Mr. Cook's contention that his communications with HOW may show that HOW made changes to the website was not asserted in opposition to the SEC's motion for summary judgment.  The SEC's facts with respect to the Xytos website thus remain uncontroverted.

[11] Mr. Mullen owned approximately 109,000 shares in Xytos, which he purchased for approximately $8000.

"prove the benefits of our cancer treatments."   [Dkt. No. 62-1 ("Xytos Website") at 44.]   This section, which was approved by Mr. Cook, contained information about two unnamed breast cancer patients who underwent rounds of "XyChloro Photodynamic Therapy" in 2009.   [Cook Dep. at 211; Xytos Website at 44-45.]   It included descriptions of the treatment and successful outcomes.   [Xytos Website at 44-45.]   Two of the descriptions are identical to the descriptions Xytos submitted to the MLBI in 2006; the only difference is that the website represented that the treatments took place in 2009, whereas Xytos's 2006 MLBI submission indicated that the treatments took place in 2005.   [Cook Dep. at 212-14.]   Mr. Cook speculates that some unknown person altered the dates in the website description.   [*Id.* at 214-15; Dkt. No. 62-6 (Xytos MLBI Submission) at 280-81; Xytos Website at 44-45.]   Mr. Cook does not remember altering the dates himself, and cannot think of anyone else who might have done it, since Dr. Cleary was not with Xytos in 2009.   This discrepancy apparently remains a mystery.   [Cook Dep. at 215.]

The "Patient Results" section of the website also listed six other "randomly selected patients with prostate cancer treated with XyChloro" in 2008 and 2009.   [Xytos Website at 46.]   It claimed that Xytos "changed to a much more aggressive XyCholro" therapy in January 2009 that resulted in "significantly improved performance."   [*Id.* at 45.]   This section further touted that Xytos treated patients with 10 different types of cancer in the first eight months of 2009, with the following results: 38% "no evidence of cancer," 23% "symptoms all gone," and 31% "much improved."   [*Id.* at 46.][12]

---

[12] Mr. Cook objects to the wording of the SEC's caption for this section of its brief:  "The Website Claimed Xytos Successfully Treated Multiple Cancer Patients in 2008 and 2009."  [Dkt. No. 72 at 20.]  Despite his objection, Mr. Cook offers no contrary facts to dispute the description in the website of cancer treatment as described by the SEC.  Nothing shows that the claims on the website were accurate.

**"Management Comments On Our Cancer Treatment."**  Mr. Cook created a section of the website which he titled "Management Comments On Our Cancer Treatment," which bore a 2011 copyright stamp, and discussed "Xytos use of the XyChloro® protocols."  It represented that "[o]ver the past 4 plus years XYTOS has achieved remarkable results in our fight against cancer . . . ."  [Cook Dep. at 50, 186-89; Xytos Website at 18.]

**"Management Comments."**  Mr. Cook created another section of the website which he titled "Management Comments."  [Cook Dep. at 50, 186-89; Xytos Website at 4.]  This section also bore a 2011 copyright stamp and stated: "We at XYTOS have concentrated on our research and development for [stem-cell therapy and tissue engineering] for the past several years."  [Cook Dep. at 186-87.]  Mr. Cook claims in this litigation that his use of the term "research" referred in part to the hair and teeth regeneration technology Xytos acquired in 2003 or 2004.  [*Id.* at 186-87.][13]  However, Mr. Cook concedes that he was aware as early as 90 days after he acquired that technology in 2003 or 2004 that it was not commercially viable.  [*See id.* at 98-99.]

In this same section of the website, Mr. Cook referred to "the success that we have now achieved in our Bio-Medical Technologies."  [*Id.* at 187-90.]  That "success," according to Mr. Cook, referred to cancer patients Dr. Cleary supposedly treated in Australia before he joined Xytos.  [*Id.* at 187-88.]  But those patients had no affiliation with Xytos.  [*Id.* at 189 ("Q.  And [Dr. Cleary's] patients had no affiliation with XYTOS, right?  A.  Correct.").]  After Dr. Cleary left Xytos in 2006 or 2007, if candor had mattered to him, Mr. Cook could have (and should have)

_____

[13] Mr. Cook contends that the Xytos website did not claim that Xytos had been developing hair and teeth technology for several years.  [Dkt. No. 72 at 20-21.]  Although this allegation is lifted from the SEC's brief where it appears as a heading, the facts laid out by the SEC in that section actually reflect that the website's information referred to "research," which Mr. Cook himself described as the hair and teeth regeneration.  [*See* Dkt. No. 60 at 12.]  Despite the misleading caption by the SEC, Mr. Cook does not dispute the factual assertions laid out in this section of the SEC's brief.

removed references on the Xytos website to Dr. Cleary's treatment of patients which occurred before he joined Xytos.  [*Id.* at 197.]

Yet, another part of this section of the website asserted that "[o]ur [photodynamic] treatment has also demonstrated significant Results" in the treatment of herpes, AIDS-related sarcomas, genital warts, and other non-cancer conditions.  [*Id.* at 200-05.][14]  This section contained photos of patients who suffered these conditions both before and after their alleged Xytos treatment.  [Xytos Website at 20-23.]  But Xytos never treated any patients for these conditions.  [Cook Dep. at 204, 205.]  Mr. Cook's explanation is simply that Xytos hired Dr. Cleary and "purchased the rights to the Cancer technology, which included all the technology and know how and all patient results from Dr. Tom Cleary."  [Dkt. No. 72 at 21.]  Mr. Cook argues that because Xytos purchased patient *results* from Dr. Cleary, it is factually accurate for Xytos to take credit for those results.  [*Id.*]  Mr. Cook's explanation of these facts does not contradict the SEC's allegation that Xytos never treated any patients with herpes, AIDS-related sarcomas, genital warts, and other non-cancer conditions.

**"Xytos – What is XyCloro Photodynamic Therapy [XPDT] and how does it work?"**

The Xytos website also contained a section titled "Xytos – What is XyCloro Photodynamic

---

[14] Mr. Cook again takes issue with the SEC's heading in its brief that states:  "The Website Claimed Xytos Treated Herpes, Genital Warts, and Other Non-Cancer Conditions."  Mr. Cook maintains that the website stated that "Photodynamic Therapy 'shows success'" in those areas.  [Dkt. No. 72 at 21-22, 30-31.]  No dispute of fact arises here from this disagreement.  The SEC's statement is consistent with Mr. Cook's statement.  We note that Xytos did not submit protocols to the MLBI for non-cancer related treatments and that Xytos's business model referred only to treatment for breast, skin, and prostate cancer.  [*Id.* at 22.]  The SEC's argument is based on the statements included on the website resulting in "claims" that Xytos treated non-cancer conditions.  The SEC has not represented this to be a direct quote from the website.  The heading in the website is: "Xytos – Treatment Shows Success in Other Areas" and includes before-and-after photographs claiming that "many recalcitrant fungal infections have likewise been shown to benefit from the XYTOS Treatment."  [Xytos Website at 23.]  These facts are not in dispute.

Therapy [XPDT] and how does it work?", which included photos of esophageal and lung cancer patients as they appeared both before and after photodynamic therapy, and represented that "[e]ndoscopically delivered PDT is an FDA approved therapy for esophageal and lung cancer." [Cook Dep. at 161-62.]  The phrase "FDA approved" was in boldface and a different color font than the surrounding text.  [Xytos Website at 60.]

   **"Xytos Centre for Advanced Medicine, Indianapolis Indiana, Look Inside."**  This section of the website contained two photos of the exterior of the Naab Road office building, a portion of which Xytos leased as a medical suite between 2006 and 2008.  [*Id.* at 84.]  Those photos were captioned "US Centre."  This site also contained 6 photos of the suite's interior, including photos of a "Typical Treatment Room."  [*Id.*]  While there is some doubt that Xytos ever occupied the Naab Road suite [Dkt. No. 62-4], photographs of the leased premises remained on the website through 2013.  Mr. Cook had the ability and opportunity to remove these photos, but he did not. [Ex. 7 ¶ 11; Cook Dep. at 218.] [15]  Although Mr. Cook submitted into evidence a video and photograph of the Naab office building, this evidence is undated and, in any event, does not conflict

---

   [15] The SEC argues that the photos on the Xytos website "suggest that the entire Naab Road Building housed the Xytos Advance Center for Medicine when, in fact, Xytos had leased only one suite in the building."  [Dkt. No. 60 at 19.]  Mr. Cook rejoins that he was entitled to show an image of the building to indicate where the Xytos office was located.  [Dkt. No. 72 at 31-32.]  We view this dispute as not germane to the SEC's motion for summary judgment.  We need not address whether the photographs of the building Xytos leased would reasonably lead a viewer of the website to a particular conclusion.  The significance of these facts here is that the photographs were still available for viewing on Xytos's website long after Xytos failed to occupy the space.

with the evidence submitted by the SEC.  [*See* Dkt. No. 72 at 23; *see also* Dkt. No. 73 (SEC Reply) at 3.][16]

**"Xytos Board of Directors."**  Under the website section titled "Xytos Board of Directors," Edward Palmer was listed as the only other Xytos board member apart from Mr. Cook.  [Xytos Website at 1.]  The section, which bears a 2011 copyright stamp, states that Mr. Palmer will "be a tremendous asset," who will "open a number of doors for XYTOS worldwide."  [*Id*. at 2.]  Mr. Palmer's service as a Xytos director ended at the latest in 2008, when he died.  [Cook Test. at 44.] Mr. Cook acknowledges that his failure to correct this information "was an over site [sic]."  [Dkt. No. 72 at 23.]

     2.     **Xytos Press Releases.[17]**

Mr. Cook prepared all the press releases issued by Xytos [Cook Test. at 48-49], which the SEC contends in this litigation contained false and misleading information and drove up the sale price of Xytos's stock.  Mr. Cook knew that the press releases would likely attract potential investors in Xytos and "move the stock price up."  [*Id*. at 148-49, 243-44, 269.]  At issue here are five specific press releases – May 26, 2010 (announcing Dr. Trotter as the new Chief Medical Officer); June 22, 2010 (announcing Dr. Dakhil as new Chief Scientific Officer); January 28, 2011

---

[16] The SEC points out that the videos and photographs submitted into evidence by Mr. Cook actually corroborate the SEC's evidence.  The first video shows a priest making the inscription "C+M+B 06" above the doorway, which apparently indicates a blessing was performed in 06, or 2006.  [*See* Dkt. No. 73 at 4, n.4.]  The second video shows a patient being treated, which must have occurred sometime in 2006 or 2007 when, according to Mr. Cook, Xytos's first and only patient was treated.  [*See id.* at 4.]  Similarly, the undated photographs of the Naab Road suite predate 2008 because Xytos did not occupy or have physical access to the suite after that date. [*See id.*]

[17] In an apparent attempt to prove that the Xytos press releases were not false, Mr. Cook addressed the press releases "line by line" in his surreply. [Dkt. No. 74 at 25-32.]  Yet, Mr. Cook did not cite to any admissible evidence to validate or corroborate the factual accuracy of the statements contained in the press releases.

(announcing Xytos's Fluorescent Scanning technology); February 18, 2011 (announcing Xytos's

relationship with DOVE clinics); and February 27, 2011 (announcing certain treatment results for

cancer patients). Each release lists Mr. Cook as the Xytos contact. [*E.g.* Dkt. No. 62-9 (Jan. 27,

2011 Press Release) at 2.] With respect to the January, 2011 press releases, Mr. Cook testified:

> A.      By this time I'd mistakenly given [Mr. Dills] a lot of shares and he was
> threatening to dump his share[s] in the market and drive the stock to nothing. And
> it was a time when we were trying to get to Germany and get things done there, and
> so I put out news.
>
> Q.      And he wanted you to put out news to promote interest in the stock?
>
> A.      He said that the people that were going to assist us with the loan wouldn't
> assist us if there was no activity in the stock and he said that we should put out
> news.
>
> Q.      And that was to generate interest in the stock?
>
> A.      Yes.
>
> . . .
>
> Q.      So you caused three press releases to be issued on behalf of XYTOS in a
> ten-day period in January 2011?
>
> A.      Correct. Yes, you're correct.
>
> Q.      And was this an effort by you to put out news at the request of Mr. Dills?
>
> A.      Absolutely.

[Cook Dep. at 243-44, 246 (Mr. Dills was the Xytos stock holder whom Mr. Cook identified as

the person to whom he had "mistakenly" given a lot of shares).]

**May 26, 2010 Press Release.** Mr. Cook represents that he issued the May 26, 2010 press

release to announce Dr. Trotter's appointment as the new Chief Medical Officer. [Dkt. No. 61-11

(May 26, 2010 Press Release).][18]   However, Dr. Trotter was not holding the position of Chief

---

[18] Mr. Cook suggests that a question of fact may exist as to the identity of the person who
actually drafted the press release related to Dr. Trotter based on an e-mail from Dr. Trotter dated
May 21, 2010. [Dkt. No. 72-28] That email indicated that Dr. Trotter was going to edit the press
release and e-mail it back to Mr. Cook; however, after review of the e-mail at his deposition, Dr.
Trotter testified that he did not recall the communication or editing the press release. [Trotter Dep.
at 97-98.]

Medical Officer of Xytos on May 26, 2010, never mind being newly hired.  Five months earlier, in January 2010, Dr. Trotter had appeared before the MLBI and withdrawn his application to become a licensed physician in Indiana due to his three failed attempts to pass certain board exams. [Trotter Dep. at 39-41.]  The MLBI informed Dr. Trotter during his appearance that the MLBI had never approved the Xytos "XyChloro" treatment.  [*Id.*]  Thereafter, Dr. Trotter believed everything was "on hold" at Xytos because the company had not been approved to treat patients and had no equipment, patients, or facilities.  [*Id.* at 61, 63, 66, 89.]  Dr. Trotter has testified that he did not consider himself Xytos's chief medical officer after January 2010 because the company never "got off the ground."  [*Id.* at 66, 89.]  The undisputed evidence reflects that Dr. Trotter never treated any patients for Xytos and stopped communicating with Mr. Cook in 2010 or early 2011.  [*Id.* at 58, 89.]

Mr. Cook explains that Dr. Trotter actually occupied two positions with Xytos – Chief Medical Officer and Senior Medical Physician.  [Dkt. No. 72 at 24.]  Mr. Cook contends that no approval was needed from the MLBI for Dr. Trotter to serve as the Chief Medical Officer for Xytos (because, he argues, no approval of Xytos technology was needed from the MLBI); however, it is undisputed that in order for Dr. Trotter to perform duties as the Senior Treating Physician for Xytos, in Indiana, he was required to be licensed to practice in the State of Indiana. [*See id.* at 25.]

Mr. Cook continues to maintain that Dr. Trotter was, in fact, the Chief Medical Officer for Xytos, including after January 2010.  [Dkt. No. 72 at 26.]  In January 2010, Dr. Trotter traveled to England to train under Dr. Julian Kenyon and the nurses at the Dover Clinic on photodynamic therapy.  [Trotter Dep. at 101-02.]  Dr. Trotter testified that he did not believe he was involved in a type of fraudulent scam when he was training with Dr. Kenyon.  [*Id.* at 108.]  Following his

withdrawal of his application to become a licensed physician in Indiana, Dr. Trotter appointed Dr.

Rispa McCray-Garrison as Senior Treating Physician for the State of Indiana for Xytos.   [*Id.*]

Regarding his time with Xytos, Dr. Trotter testified:

> Q.     So anything that happened after January, 2010, you were not chief medical
>        officer of Xytos?
>
> A.     Correct.

[*Id.* at 75-76.]

When shown an email dated May 21, 2010 [Dkt. No. 72-28], Dr. Trotter explained:  "I

answered no that I was not a director of a publically traded company on my etrade setup account

as by [sic] chief medical officer I am only in charge of the medical doctors and the medical section

of the company and not the financial part."  [Trotter Dep. at 76-77.]  Dr. Trotter testified:  "I do

recognize the e-mail.  I was still on hold until the situation was resolved, so I stated that I was still

not chief medical officer when I went – okay."  [*Id.* at 77-78.]  In response to continued questioning

on this issue by Mr. Cook, Dr. Trotter responded, "Technically you're kind of like – you're kind

of assuming."  [*Id.* at 78.]  Dr. Trotter never claimed to have been the Chief Medical Officer for

any time other than for the one month between December, 2009 and January, 2010, as he

explained:

> I didn't resign, because we have nothing – it was oral, we have nothing in writing.
> I've never received any money.  I haven't treated any patients.  There was no letter
> to resign to, because there was no contract.  So to me, I was chief medical officer
> from December, 2009, which it states in my resume, until the meeting we had at
> the State Medical Board, which was January of 2010.  It was on hold until the
> situation would resolve.  If it had resolved, where the legal stuff was in place and
> the equipment, I would have been happy to do it; however –

[*Id.* at 89.]

The increase in Xytos's stock prices that occurred following the May 26, 2010 press release

is undisputed.  The closing price of Xytos's stock on May 26, 2010 was $0.059.  The stock price

25

increased to $.085 per share on May 27, 2010 and leveled out at $.08 per share on May 28, 2010 (after opening at $.09). [*See* Dkt. No. 72-4 (Xytos Historical Stock Prices) at 30.] Mr. Cook sold 230,900 shares on May 27, 2010 and 666,390 shares on May 28, 2010. [Jones Decl. at Table B.] Over the two days following the issuance of this press release, Mr. Cook sold more than 140,000 Xytos shares for a total of $11,609. [*Id.*]

June 22, 2010 Press Release.  On June 22, 2010, Mr. Cook issued a press release titled "XYTOS Announces the Appointment of Farouk Dakhil, PhD as the Company's New Chief Scientific Officer." [Dkt. No. 62-11 (June 22, 2010 Press Release) at 1.] Dr. Dakhil began as Xytos's Chief Scientific Officer when the company was formed in 2004, six years prior to the press release. [Cook Dep. at 45-46.] There was nothing new about Dr. Dakhil's supposed involvement with Xytos as of June 22, 2010. [*Id.* at 249.] Mr. Cook contends in response to the SEC's motion for summary judgment that "[w]hat was new was the fact that Xytos was required to issue 2 Million shares to Dr. Dakhil for his appointment as Chief Scientific Officer for Xytos." [Dkt. No. 72 at 27 (citing Def. Ex. 30 (Copy of Xytos shares issued to Dr. Dakhil)).] However, the issuance of stock certificates, even if true, does not contradict Mr. Cook's deposition testimony that there was nothing "specifically new to XYTOS" when the June 2010 press release was issued. [Cook Dep. at 249.]

January 18, 2011 Press Release.  On January 18, 2011, Mr. Cook issued a press release titled "XYTOS Establishes Partnership with DOVE Clinics." [Dkt. No. 62-8 (Jan. 18, 2011 Press Release).] This release stated the partnership "will allow for a significant increase in revenues for XYTOS." [*Id.*] Xytos, however, had no revenues in 2011 and Xytos never received any revenue from the Dove Clinics partnership. [Cook Dep. at 241-42.] Xytos never had *any* revenues from any source. Thus, *any* revenues would arguably represent a significant increase, but this press

release nonetheless clearly suggests otherwise.  Mr. Cook's obviously weak rejoinder in defense of this release is that "the new[s] release did not say that Xytos would be making immediate revenues." [Dkt. No. 72 at 27 (citing Press Release).]  The feebleness of that explanation actually erodes rather than salvages Mr. Cook's defense of the release language.

**January 27, 2011 Press Release.**  Nine days later, on January 27, 2011, Mr. Cook issued another press release, this one titled "XYTOS Announces Cancer Patient Results" that listed the results of treatments of six purported Xytos patients. [Dkt. No. 62-9 (Press Release) at 1.]  It also directed the public to the Xytos website for "additional results."  [*Id.*]  In truth, there were no cancer patient results to announce in January 2011. [Cook Dep. at 244 ("Q.  And when you issued the press release, there were no new cancer patient results from XYTOS; right?  A.  There wouldn't be any new ones, no.").]  Mr. Cook said he issued the release, in part, because he was trying to establish Xytos in Germany at that time.  [*See id.* at 243.]  Mr. Cook does not dispute these facts other than to say that "the patient results were new to the Public." [Dkt. No. 72 at 28.]

**January 28, 2011 Press Release.**  The very next day, January 28, 2011, Mr. Cook issued another press release, titled "XYTOS Introduces Their Cancer Diagnostic Fluorescent Scanning Technique" [Dkt. No. 62-10 (Press Release) at 1], directing the public's attention to photos depicting applications of the technique on the Xytos website.  [Cook Dep. at 247-48.]  Mr. Cook claims the technique was used by Dr. Cleary to treat patients in Australia in 2003 or 2004.  [*Id.* at 247.]  However, there was nothing new about the scanning technique as of January 2011.  [*Id.* at 247.]  Again, Mr. Cook does not dispute these facts other than to represent that "the Cancer Diagnostic Scanning technique was new to the Public."  [Dkt. No. 72 at 28.]  Between January 27 and January 31, 2011, Mr. Cook sold approximately 170,000 Xytos shares which garnered more than $63,000.  [Jones Decl. at Table B.]

### 3. Xytos Overview/Prospectus.

In or around 2011, Mr. Cook sent a 13-page "overview" of Xytos which he had prepared to at least two recipients.  [Cook Dep. at 253-55; Dkt. No. 62-21 (Xytos Overview).]  Mr. Cook's overview represented that Xytos intended to use any funds raised from the prospectus "for our Medical Facility Expansion" and that Xytos had been "granted permission to actually treat patients in the United States WITHOUT FDA approval.  This permission was UNIQUE."  [Dkt. No. 62-12 at 11-12 (emphasis in original).]  The prospectus also stated that Xytos already secured approvals for its treatment technique in Iceland and that "Xytos will have revenues starting in 2011."  [*Id.* at 4-5.]  Mr. Cook projected revenues based on the sale of the treatment modality of approximately $22 million in 2012 and $126 million in 2015.  [*Id.*]  The two individuals to whom Mr. Cook provided his "overview" ultimately purchased Xytos shares from Mr. Cook via private transactions.  [Dkt. No. 61-12 (Cook's Confidential Memorandum) at 4-5 ("XYTOS was setting up the company in Germany at the time and XYTOS was looking to borrow funds to pay the expenses in Germany . . . XYTOS elected to pay the expenses by raising funds from existing shareholders.  Further note that the XYTOS shareholders that assisted XYTOS with this capital raise along with other shareholders understood that German Shares would be given for this capital raise and any U.S. shares allocated would not dilute the existing shareholders."); Jones Decl. at ¶ 20.]  Mr. Cook maintains that these individuals did not actually purchase shares of Xytos, Inc. rather, they received share certificates for Xytos International, Inc. in exchange for their investments.  [Dkt. No. 72 at 28 (citing Dkt. No. 72-9 (Xytos International Share Certificates).]

**E.      Assumed True Allegations Against Xytos and Asia Equities.**

As noted previously, given the clerk's entry of default against Xytos and Asia Equities, the

allegations in the Complaint against them are assumed true.  The relevant facts based on those

defaults are as follows:

- Xytos is Mr. Cook's alter ego.  Mr. Cook, as the company's chairman and CEO, is the only person who acts on its behalf.  [Compl. ¶ 3.]

- Mr. Cook owned over half of the outstanding tradeable shares in Xytos.  He owned those shares in the name of Asia Equities, another alter ego company of Mr. Cook's. [*Id.* ¶ 4.]

- In or around 1999, Mr. Cook, through Asia Equities, acquired nearly 5 million (or over 30%) of the approximately 16 million outstanding shares in Xytos' predecessor company, ISM Holdings, Inc.  Mr. Cook changed the company's name to Xytos in 2004.  [*Id.* ¶ 39.]  In 2009 and 2010, Mr. Cook deposited millions of Xytos shares into corporate brokerage accounts he opened at Merrill Lynch and E*Trade.  He opened those accounts in the name of Asia Equities.  [*Id.* ¶ 42.]  Mr. Mr. Cook did not deposit all of his Xytos shares into the brokerage accounts. He continued to hold some shares in certificated form.  [*Id.* ¶ 43.]

- Xytos conducts no business, biomedical or otherwise.  [*Id.* ¶ 45.] Since at least 2010, Xytos has had no employees, officers, or directors other than Mr. Cook.  [*Id.* ¶ 46.]  It has not sold any products or services, generated any revenue, treated any patients, or conducted any research.  It has no FDA approvals.  [*Id.*]  Xytos has not had office space since 2008.  Mr. Cook runs the company from his home in Indianapolis.  [*Id.* ¶ 47.]  Xytos has no treatment center or other medical facilities. It has nominal, if any, assets.  [*Id.* ¶ 48.]

- Additionally, from late 2010 through July 2012, Mr. Cook published false and misleading information about Xytos on a website operated by OTC Link, where Xytos shares were traded.  [*Id.* ¶¶ 23-25, 64.]  For example, in July 2012, Mr. Cook published a Xytos income statement listing a cash balance of $110,559 for the quarter ending March 31, 2012.  That amount was false and misleading because Xytos's bank accounts on March 31, 2012 contained only $2,657.  [*Id.* ¶ 67.]  The July 2012 income statement also listed $20,508 in revenue for the quarter ending March 31, 2012.  In fact, Xytos did not have any revenue – that is, income from business operations such as the sale of goods or services – in the second quarter or in any other quarter since at least 2010.  [*Id.* ¶ 68.]  Throughout 2011, Mr. Cook published several Xytos balance sheets on OTC Link showing cash balances of $102,236 as of March 31, 2011, $100,654 as of June 30, 2011, and $113,421 as of September 30, 2011.  Those amounts were false and misleading because Xytos's bank accounts as of those dates contained only $600, $6,470, and $171, respectively. [*Id.* ¶ 69.]

- While falsely portraying Xytos to the investing public, Mr. Cook regularly sold his Xytos shares on the open OTC market. He made these sales through the Asia Equities brokerage accounts at E*Trade and Merrill Lynch. [*Id.* ¶ 74.] From January 2010 through March 2013, Mr. Cook sold nearly three million Xytos shares from the Asia Equities brokerage accounts. Mr. Cook sold Xytos shares nearly every month during that period, and in most cases several times per month. [*Id.* ¶ 76.]

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the Court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *Id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *Id.*, at 247, nor the existence of "some metaphysical doubt as to the material facts," (*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)) will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000). A disputed fact must be material. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . the requirement is that there be no *genuine* issue of material fact." *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 460 (7th Cir. 2014). Southern District of Indiana Local Rule 56-1(f)(1) provides that the "court will assume that the facts as claimed and supported by admissible evidence by the movant are admitted" unless specifically controverted by the non-movant with admissible evidence or shown to be unsupported by the movant's admissible evidence.

The moving party "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323.   The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Id*. at 325; *Doe v. R.R. Donnelley & Sons, Co.,* 42 F.3d 439, 443 (7th Cir. 1994).   Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994).

## ANALYSIS

### A.   Mr. Cook Violated the Antifraud Provisions of Federal Securities Law.

The SEC's motion seeks judgment as a matter of law holding Mr. Cook liable for having committed securities offenses by making material misrepresentations about Xytos to investors and potential investors and by engaging in a fraudulent securities scheme.   Mr. Cook responds that, among other things, the SEC has failed to demonstrate that he acted with actual knowledge of any violation or that he acted knowingly to contribute to any such violation and, in any event, his alleged misrepresentations were not false.   Mr. Cook contends that "all of Plaintiff's facts in this case are IN DISPUTE."  [Dkt. No. 72 at 42 (emphasis in original).]   However, Mr. Cook's specific response consists of a re-characterization of the SEC's factual averments.  [*See* Dkt. No. 72 at 29-36.]   We have for the most part previously addressed these alleged disputes.   In sum, Mr. Cook has failed to set forth evidence to create any genuine issues of material fact that rebut the SEC's evidentiary showing.   Only one logical conclusion flows from the undisputed facts before us:   Mr. Cook committed numerous violations of the Securities Act's antifraud provisions.

The first alleged violation of the anti-fraud statutes advanced by the SEC is that Mr. Cook violated Section 17(a)(1), (a)(2), and (a)(3) of the Securities Act, 15 U.S.C. § 77q(a)(1)-(3), and

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10-b thereunder, 17 C.F.R. § 240.10b-5. "These statutes require that the SEC establish that Defendants made misrepresentations or omissions of material fact in connection with the offer or sale of a security." *S.E.C. v. Montana*, 464 F. Supp. 2d 772, 783 (S.D. Ind. 2006); *see also SEC v. Koester*, 13 F. Supp. 3d 928, 932-33 (S.D. Ind. 2014). Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act also require the SEC to prove scienter, whereas Sections 17(a)(2) or (3) require a showing only of negligence on the part of a defendant. *Id.* (citation omitted). A misstated or omitted fact is "material" where a substantial likelihood exists that a reasonable investor would have viewed the true fact "as having significantly altered the 'total mix' of information available." *Basic v. Levinson*, 485 U.S. 224, 231-32 (1988) (quoting *TSC Indus. v. Northway*, 426 U.S. 438, 449 (1976)). Scienter is the mental state of intending to deceive, manipulate, or defraud possessed by a company or any individual(s) who controls the company. *Aaron v. SEC*, 446 U.S. 680, 687, n.5, 691, 697 (1980). "[R]eckless disregard of the truth counts as intent for this purpose." *SEC v. Jakubowski*, 150 F.3d 675, 681 (7th Cir. 1998); *Montana,* 464 F. Supp. 2d at 784 ("A company may have imputed to it the scienter of the individuals who control it.") (citation omitted).

The Section 10(b) "in connection with" requirement is satisfied if the fraud "somehow touches upon" or has "some nexus" with any securities transaction. *SEC v. Clark*, 915 F.2d 439, 449 (9th Cir. 1990). Unlike private litigants, the SEC is not required to prove investor harm or reliance to be successful on its claim. *See McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 931 (7th Cir. 2011).

### 1.    Mr. Cook Made Numerous False and Misleading Statements About Xytos.

The law is well-settled that statements that create a false impression about a company are false, misleading, and will constitute a misrepresentation capable of supporting a claim for

securities fraud.  *Phillips v. LCI Intern., Inc.*, 190 F.3d 609, 613 (4th Cir. 1999) ("If a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision, then the statement satisfies the initial element of a § 10(b) claim."); *McMahan & Co. v. Wherehouse Ent., Inc.,* 900 F.2d 576, 579 (2d Cir.1990) ("A statement is misleading if a reasonable investor would have received a false impression from the statement.  Moreover, statements, although literally accurate, can become, through their context and manner of presentation, devices which mislead investors. For that reason, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead . . . .") (citations omitted); *SEC v. StratoComm Corp.*, 2 F. Supp. 3d 240, 257 (N.D.N.Y. 2014); *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011).  The SEC must prove only one misrepresentation or omission of material fact to establish liability.  *SEC v. Yuen*, No. 03-cv-4367, 2006 WL 1390828, at *36 (C.D. Cal. Mar. 16, 2006).  Here, the SEC has proven many more than a single, isolated false or misleading statement that created a false impression about the economic viability and security of Xytos.  Indeed, the SEC has established an extensive and complex pattern of false and misleading statements knowingly made by Mr. Cook in support of its claims of securities fraud violations.

As detailed above, Mr. Cook's misrepresentations about the nature of Xytos's business, its successes, and financial stability as well as its plans, its performance, and its progress include the following:

- That Xytos was a bio-medical company that successfully treated patients suffering from cancer and other illnesses;

- That Xytos maintained a website created and controlled entirely by Mr. Cook after 2007, which represented to the public that:

  - Xytos successfully treated multiple cancer patients during 2008 and 2009;

- Xytos's photodynamic therapy was FDA approved;

- Xytos successfully treated other non-cancer-related medical conditions;

- Xytos had successfully developed hair and teeth regeneration technology as of 2011; and

- Xytos maintained its business at a location on Naab Road when those leased premises were vacated by Xytos in 2008.

- That press releases were issued by Mr. Cook on behalf of Xytos in 2010 and 2011, which claimed that:

  - Xytos had experienced new successes in treating cancer patients, when in fact the patients were not associated with Xytos and no results had been generated in 2011;

  - Xytos was introducing a cancer scanning technique, when in fact no new technique existed;

  - Xytos had entered into a new partnership with Dove, which promised substantial increases in revenues, when in fact Xytos had generated no revenues to increase;

  - Xytos had made appointments of medical and scientific officers for the company, when in fact the doctors denied they were officers of Xytos because the company was "on hold";

  - Xytos had entered into an affiliation agreement with Dr. Dakhil in 2011, when in fact Dr. Dakhil's employment with Xytos had commenced many years prior to 2008;

  - Xytos had obtained regulatory approval for its technology in Iceland as well as permission to treat patients in the United States without FDA approval where no approvals had ever been given;

  - Xytos intended to use investor funds to expand its medical facility to allow it to treat more patients and generate more revenue, when in fact it had no such plans.

Mr. Cook has not identified or otherwise adduced any conflicting evidence; his response to the various statements and claims as outlined above is that they are simply untrue. Mr. Cook's obvious intention in each of these instances in which he spewed out fabricated information was to drive up the price of Xytos's stock and to promote its sale.

### 2.      Mr. Cook's Misstatements Were Material.

The test for whether a misstatement is "material" in the securities law context is whether the misstatement "significantly altered the total mix of information made available" to investors. *Basic*, 485 U.S. at 231-32.  Here, Mr. Cook's representation among others that Xytos was a revenue-generating bio-medical company that successfully treated cancer patients was plainly false.  Xytos investors have testified that it would have been important to them to know that Xytos did not actually treat any patients or generate revenue, and, in fact, did not have any facilities to provide such treatment after 2008.  [Mullen Decl. at ¶¶ 5-8; Wojtan Dep. at 85-86.]

The issue of materiality can be resolved on summary judgment when the misrepresentations "are so obviously important to an investor, that reasonable minds cannot differ on the question of materiality."  *TSC Indus.*, 426 U.S. at 450; *StratoComm*, 2 F. Supp. 3d at 257 ("[Defendant's] statements falsely portrayed it as a development-stage company that had progressed to the operational stage with a finished product and sales, when it had not. These misstatements are material because they relate to whether the company has a product to sell and a viable business model.") (granting summary judgment in favor of SEC); *SEC v. Ferrone*, No. 11-cv-5223, 2014 WL 5152367, at *5-7, 26 (N.D. Ill. Oct. 10, 2014) (granting summary judgment on SEC's fraud claims after finding that misrepresentations about drug company's license for a specific drug – the company's primary asset – and the drug's market potential were material).  In this case, not only could reasonable minds not differ as to the materiality of Mr. Cook's misrepresentations, Investor Jude Mullen's declaration establishes that he, as an actual investor, regarded these misrepresentations as material.  Mr. Mullen declared that after his first purchase of Xytos stock in 2010 but before his last purchase in 2013, he visited *www.xytos.com* and reviewed various statements and photographs, with the following results:

6. The statements and photos on the Xytos website regarding Xytos's purported business were important factors in my decision to invest in Xytos.  Based on my review of the Xytos website, I understood that Xytos was treating cancer patients in the United States.  It would have been important to my investment decision to have known that Xytos was not treating any cancer patients at the time of my investments.

7.  Based on my review of the Xytos website, I understood that Xytos was generating revenues from treating cancer patients.  It would have been important to my investment decision to have known that Xytos never generated any revenues from treating cancer patients or otherwise.

8.  Based on my review of the Xytos website, I understood that Xytos was treating cancer patients in some of medical facility in the United States.  It would have been important to my investment decision to have known that Xytos did not own or lease any medical facility in the United States at the time of my investments.

[*Id.* at ¶¶ 5-8.]  We have no difficulty concluding that Mr. Cook's misrepresentations were material as a matter of law because reasonable minds could not – and apparently did not – differ as to the importance or impact of the information about the nature, extent, and status of Xytos's business to any investor during the relevant time period.

### 3.    Mr. Cook's Actions Facilitated the Scheme.

The evidence of Mr. Cook's role in perpetrating various deceptions to facilitate his scheme includes the following:

·    He altered the dates of the patient results data on Xytos's website;

·    He deceived private investors when he induced them to invest and then used those funds for his personal expenses, after having assured the investors they would be applied to Xytos's alleged German business;

·    He informed one investor that he was merely the CEO of Xytos and did not own a single share of Xytos stock; and

·    He placed his wife's signature on an Asia Equities' corporate resolution and failed to disclose his (or her) affiliation with that company whose shares he planned to sell.

These facts unequivocally demonstrate that Mr. Cook's actions and misrepresentations constituted a concerted effort by him to further a scheme through which he could and did defraud investors.

36

4.      **Mr. Cook's Misrepresentations Arose Out of and Related to the Sale of Securities.**

One of the elements of the SEC's Rule 10b-5 claims requires evidence establishing that Mr. Cook's untrue material statements were made in connection with the purchase or sale of securities. *See Koester*, 13 F. Supp. 3d at 932-33. These so-called "nexus requirements" are broadly and flexibly construed in SEC enforcement actions. *See, e.g., SEC v. Rana Research*, 8 F.3d 1358, 1362 (9th Cir. 1993) ("[The Section 10(b) nexus requirement] in SEC actions remains as broad and flexible as is necessary to accomplish the statute's purpose of protecting investors."). Here, no such flexibility is necessary in determining whether this element has been satisfied because the undisputed evidence establishes beyond question that Mr. Cook's misrepresentations were made in connection with the purchase and sale of Xytos securities to investors.

Mr. Cook sold nearly 5 million shares of Xytos stock on the open market between 2009 and 2012, and thousands of shares of Xytos stock to individual investors through private transactions during 2010. These public and private sales easily satisfy the "in connection with" requirements because they coincided in time and in substance with Mr. Cook's many misrepresentations about the nature of Xytos's business and its financial vitality. *See SEC v. Zandford*, 535 U.S. 813, 822 (2002) ("It is enough [for purposes of the 'in connection with' requirement] that the scheme to defraud and the sale of securities coincide."); *see also Jakubowski*, 150 F.3d at 679 ("How could there be a closer 'connection' between statements and 'the purchase or sale' [then statements made directly to a purchaser or seller to induce the purchase or sale].") We ask the same rhetorical question as did the court in *Jakubowski*: How could there be a closer connection between Mr. Cook's misrepresentations and the purchase of or sale to securities by investors?

5.      **Mr. Cook's Misrepresentations Were Knowingly Untrue.**

To succeed on its claims, the SEC must be able to establish the necessary element of scienter – proof that Mr. Cook knew his representations were false when he made them.  Scienter, as we previously noted, is a "mental state embracing an intent to deceive, manipulate, or defraud." *Aaron v. SEC*, 446 U.S. 680, 686, n.5 (1980).  An admission by Mr. Cook that he intended to deceive, manipulate, or defraud is not required; scienter can be inferred from the nature and timing of defendant's knowing misrepresentations.  *See, e.g.*, *SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008) (stating that the SEC establishes scienter when it proves that defendants "knew the representations they made to investors were false"); *Montana*, 464 F. Supp. 2d at 784 (granting summary judgment on scienter-based claims where defendant "had to have known that his statements" were false).  The undisputed evidence before us demonstrates that Mr. Cook was thoroughly and indisputably aware when he made his representations to investors and to the public that they were false.[19]

---

[19] Mr. Cook asserts that "Defendants will clearly show the Jury, through Documentary Evidence, Affidavits and Testimony at trial, that the Defendants acted in good faith and made NO *material misrepresentations or materially misleading omissions;* and further at **NO TIME** did Defendants ever undertake any actions **with any scienter intent or negligence.**"  [Dkt. No. 72 at 37-38 (emphasis in original) (single quotation mark omitted)].  Mr. Cook's promise of future evidentiary proof is not enough to refute the SEC's evidence of knowing misstatements or to avoid summary judgment.  In the oft-cited phrase, this is the "put up or shut up" moment in this litigation.

Mr. Cook has admitted that he knew the representations made to investors and the public in Xytos's press releases were false.[20]  He issued three press releases containing false statements citing new information knowing at the time they were released that such "new" information did not exist:

·     Mr. Cook has admitted that the 2011 press release, "XYTOS Announces Cancer Patient Results," was untimely because only one patient was treated many years prior.  [Cook Dep. at 244.]

·     Mr. Cook has admitted that a June 2010 press release announcing as follows – "XYTOS Announces the Appointment of Farouk Dakhil, PhD as the Company's New Chief Scientific Officer" – was untimely because Dr. Dakhil's appointment

---

[20] The parties take us on an irrelevant argumentative detour by debating Mr. Cook's alleged motive to deceive.  The SEC argues that Mr. Cook had motive to issue false news releases – i.e., for personal profit – which may be relevant to the issue of scienter.  *Voss v. SEC*, 222 F.3d 994, 1005 (D.C. Cir. 2000).  According to the purchase and sale chart in SEC Exhibit 8, Table B, shortly after the press release announcement Mr. Cook sold large quantities of shares at stock prices higher than during the days before press releases were issued.  Specifically, between January 27 and 31, 2011, Mr. Cook sold 170,000 Xytos shares for more than $63,000.  Similarly in 2010, Mr. Cook sold 900,000 shares on the two days following the May 26, 2010 press release.  Mr. Cook disputes that generating sales of stocks to increase his profit was his motive, noting that he could have issued a news release announcing Dr. McCray-Garrison as Xytos's New Senior Treating Physician, but did not.  [Dkt. No. 72 at 32]  He stresses that he never asked Dr. Trotter for any funds or to raise funds from other people [*Id.* at 32-33].  Although true, these facts do not contradict other undisputed material facts that the statements made by Mr. Cook were knowingly false when he made them.  The fact that Mr. Cook *could* have issued additional press releases or asked a director to invest or raise funds does not establish his lack of motive.

Mr. Cook also argues that he did not profit from the sale of Xytos shares because the shares were purchased by Asia Equities from ISM Holding (the predecessor to Xytos) in 1998 or 1999 for $.50 a share.  [Dkt. No. 72 at 33.]  Mr. Cook claims that because the Xytos stock price never exceeded $.50 per share, it did not generate a profit.  Additionally, Mr. Cook maintains that he was entitled to a salary or Xytos stock each year since 2004 as compensation, pursuant to his employment contract, but he did not take either in order not to dilute the value of shares held by existing shareholders.  [*Id.* at 33-34.]  The SEC rejoins that Mr. Cook cannot claim a $.50 basis on the stock purchased by Asia Equities a decade prior to his sale of Xytos stock.  [Dkt. No. 73 at 15-16.]  Because Mr. Cook did not share the $503,513 in profits with the original investors in ISM, instead spending the money on himself, he cannot claim a $.50 basis for the stock he later sold.  [*Id.*]  Although we share the view that Mr. Cook's profit analysis is a red herring, we need not resolve the question of motive to determine whether Mr. Cook knowingly made material misrepresentations in connection with a securities transaction; he did, beyond question.

occurred in 2004, six years prior, and thus, there was nothing new to announce.  [*Id.* at 45-46, 249.]

· Mr. Cook has admitted that a January 2011 press release, "XYTOS Introduces Their Cancer Diagnostic Fluorescent Scanning Technique," was not new in January 2011 because Dr. Cleary had used this technique in 2003 or 2004 in Australia.  [*Id.* at 247-48.]

Mr. Cook has also admitted that he knew the effect of these press releases would be to drive up stock prices.  [*Id.* at 238-39, 148-49, 269.]  Indeed, Mr. Cook testified that he was afraid that if Xytos did not issue these news releases, a disgruntled shareholder might dump his stock, causing the stock price to plummet to zero.  [*Id.* at 243.]  This evidence along with the other abundant proof clearly establishes Mr. Cook's "mental state embracing an intent to deceive, manipulate, or defraud."

We have concluded that Mr. Cook knew that the information he placed on the Xytos website was false.  He has admitted that he was the only person with control over the content of the Xytos website after 2007, and that the dates on the website had been altered to make it appear that Xytos treated cancer patients during 2008 or 2009.  Although Mr. Cook professes to lack a specific memory of his having altered the dates, his alleged failure to recall does not create a genuine issue of material fact, given that he has acknowledged that someone altered the patient result dates and that he knows of no one other than himself who could have made those changes. Mr. Cook has further admitted that Xytos had obtained no FDA or Icelandic approvals for its technology, explaining that Xytos had some form of "unique permission" to treat patients without necessity of FDA approval.  Although Xytos vacated the leased space for its medical facility in 2008, Mr. Cook nonetheless permitted photographs of the Xytos "business premises" to remain on the Xytos website through 2013.  At the very least, this evidence demonstrates that Mr. Cook was "reckless in disregarding a substantial risk" that his Xytos website was false or misleading.  *See Lyttle*, 538 F.3d at 603.

40

Summary judgment in Security Act violation cases is appropriate where, as here, a defendant issues press releases or posts website content he knows at the time to be false. *See, e.g.*, *SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1095-96 (9th Cir. 2010) (affirming summary judgment for the SEC and rejecting claim that defendant's subjective belief that press releases were not misleading created a triable issue of fact where defendant testified that he knew information was incorrect); *StratoComm*, 2 F. Supp. 3d at 249-53 (granting summary judgment in favor of SEC on its fraud claims where defendant knew that statements he made in press releases and on the company website were false); *Ferrone*, 2014 WL 5152367, at *4-5, 9 (granting summary judgment in favor of SEC on its fraud claims where defendant posted videos to drug company website falsely claiming FDA approval); *SEC v. Shavers*, No. 13-cv-416, 2014 WL 4652121, at *8-9 (E.D. Tex. Sept. 18, 2014) (granting summary judgment to SEC where defendant used bitcoin website and an online forum to disseminate false statements).  The SEC has fully satisfied its burden to show that Mr. Cook knew his website misrepresentations were false at the time they were posted and thereafter during the long periods of time they remained accessible to the public.

**6.    The Claim that Private Sales of Stock Involved Xytos International, Inc. Is A Sham.**

According to Mr. Cook, on June 14, 2012, seven Xytos shareholders received, via private sales, shares in Xytos International, Inc., a foreign entity [Dkt. No 72-9 (Xytos International, Inc. stock certificates)], which transactions are not within the reach of federal antifraud restrictions. This claim cannot be reconciled with other evidence before the Court.  Mr. Cook's interrogatory responses, purchase agreements, and a "confidential memo" responding to the SEC's Complaint [Dkt. No. 61-12] establish that these investors purchased shares in *Xytos, Inc.* – not Xytos International, Inc.  [Dkt. No. 73 at 16-17.]  In response to an interrogatory seeking the identity of

every person who invested in Xytos, Mr. Cook stated that Karl Obertik and Gerald Wotjan invested in Xytos.  [Def. Interrog. Resp. at No. 3.]  Mr. Cook claimed that the remaining five investors invested in Xytos International.  [*Id.*]  Yet, four of those five investors signed purchase agreements stating each was purchasing shares in Xytos, Inc., not Xytos International.  [Dkt. No. 62-20 (Herrell Purchase Agreement); Dkt. No. 62-22 (Purchase Agreements).]  Finally, Mr. Cook's "Confidential Memo" in response to the SEC's Complaint also indicates that these five investors purchased shares in Xytos, Inc.  [Dkt. No. 61-12 at 4-5.]  The only conflicting information here is Mr. Cook's interrogatory response and certain unauthenticated stock certificates.  A genuine issue of material fact cannot be created by an affidavit that conflicts with prior sworn testimony; likewise, Mr. Cook is not permitted to contradict his interrogatory responses in subsequent claims and arguments, particularly when he attempts to do so by relying on unauthenticated stock certificates.  *See, e.g., Viasystems Technologies Corp., LLC v. Landstar Ranger, Inc.*, No. 10-C-577, 2011 WL 2912763, at *3 (E.D. Wis. July 15, 2011) (internal citations omitted) ("The 'sham affidavit' rule prohibits litigants from creating sham issues of fact with affidavits that contradict their prior sworn testimony, such as answers to interrogatories.  If such contradictions were permitted . . . the very purpose of the summary judgment motion – to weed out unfounded claims, specious denials, and sham defenses – would be severely undercut."); *Thompson v. White*, No. 01 C 75, 2002 WL 31269342, at *3 (N.D. Ill. Oct. 9, 2002) *aff'd*, 67 F. App'x 355 (7th Cir. 2003) ("A party may not create a genuine issue of fact by submitting an affidavit that contradicts his prior deposition testimony and interrogatory responses, and Thompson's affidavit is therefore insufficient to create a genuine issue of material fact.").  Thus, we hold that the SEC's antifraud

claims do, indeed, apply to Mr. Cook's private placements, despite his sham attempts to create an issue of fact.[21]

### 7.    Xytos Violated the Securities Laws' Antifraud Provisions.

The SEC in its Application for Default Judgment [Dkt. No. 64 at 5-6] has established that Xytos violated the antifraud provisions "by falsely portraying itself as an operational biomedical company specializing in advancing cancer diagnostics and treatment," in that, since 2010, it has conducted no business, had no employees (other than Mr. Cook), has sold no products or offered any services, and has occupied no business premises or treatment facilities.  Mr. Cook's fraudulent actions on behalf of Xytos allowed Xytos to raise more than $500,000 from investors in open market and private placement sales of Xytos stock.  This conduct by Xytos clearly violated the antifraud provisions of the federal securities laws.

### 8.    Mr. Cook Violated the Antifraud Provision of the Securities and Exchange Act.

Mr. Cook's actions, individually and as the agent of his company, were knowingly made and consisted of material misrepresentations connected with the offer and sale of securities.  Thus, Mr. Cook is personally liable for having violated the antifraud provisions of the Securities Act and Exchange Act.  The SEC's motion for summary judgment as to these claims is in all respects is granted.

---

[21] Mr. Cook cites the Affidavit of Jim Adams, President of Integral Stock Transfer Agency, as evidence that the sale and/or transfer of Xytos International shares did not require registration under Canadian law or pursuant to the Frankfurt Stock Exchange Rules.  [*See* Dkt. No. 72 at 40; Adams Aff. at ¶ 9.]  These statements clearly comprise conclusions of law and as such are not factual averments.

**B.      Mr. Cook and Asia Equities Violated the Registration Provisions of the Securities Act.**

Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce, unless an exemption from registration applies.   15 U.S.C. §§ 77e(a), (c).  Every sale of securities is thus either registered, exempt, in violation of Sections 5(a) and 5(c).  *See Allison v. Ticor Title Ins. Co.*, 907 F.2d 645, 648 (7th Cir. 1990).  Registration is not a mere technicality; Section 5 was "designed to be a principal statutory tool for protecting the investing public."  *Platforms Wireless*, 617 F.3d at 1085.  Its purpose "is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions."  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124 (1953).

Section 5 imposes strict liability on sellers of unregistered securities regardless of intent, fault, or negligence.  *See SEC v. Bronson*, 14 F. Supp. 3d 402, 408 (S.D.N.Y. 2014).  For purposes of summary judgment, the SEC satisfies its burden of establishing a prima facie Section 5 violation where it shows that "(1) each defendant directly or indirectly sold or offered for sale a security; (2) no registration statement has been filed as to the security; and (3) the offer or sale was made through the use of interstate facilities or the mails."  *Montana*, 464 F. Supp. 2d at 782 (granting summary judgment to the SEC on its Section 5 claims).

It is undisputed that Mr. Cook did not file any registration statements for any of the open-market Xytos stock sales.  [Cook Dep. at 251; Dkt. No. 62-27 (Attestation of SEC records custodian).]  The SEC has set forth a clear prima facie showing of Section 5 violations by Mr. Cook with respect to his open-market sales, as follows:

| Element | Undisputed / Irrefutable Facts |
|---|---|
| **Cook Offered or Sold Securities** | · Cook admits that, while he was CEO of Xytos, he regularly sold Xytos shares on the open market.  Between 2009 and 2012, Cook sold 4,813,109 shares of Xytos through various brokerage accounts.  He made $503,513 in proceeds from those sales; |
| **No Registration Statement Was Filed or In Effect** | · Cook admits – and the SEC has confirmed (*see* Ex. 45) – that Cook did not file a registration statement with the SEC for any of his open-market sales of Xytos shares; and |
| **Cook Used the Means of Interstate Commerce** | · Cook, domiciled in Indiana, sold Xytos shares on the open-market by placing online sales orders through E*Trade, his New Jersey-based broker-dealer (*see* Ex. 10). |

[Dkt. No. 60 at 26-27.]  In similar fashion, Asia Equities violated the registration requirements of the Securities Act when, under the aegis of Asia Equities, Mr. Cook sold millions of shares of Xytos stock through the E*Trade and Merrill Lynch brokerage accounts thereby allowing it to profit from Mr. Cook's misrepresentations.  Mr. Cook does not dispute these facts.[22]

Mr. Cook's first response to this claim by the SEC is that it was Asia Equities, not Mr. Cook, who conducted these sales of stock.  [Dkt. No. 72 at 18 ("The account was in the name of Asia Equities, Inc. not in the name of Cook.") (citing Plaintiff's Ex. 10 at Dkt. No. 72-10).] However, the undisputed evidence shows that Mr. Cook controlled the Asia Equities brokerage accounts, he personally authorized the sales, and he personally withdrew the sales proceeds and used them for his personal expenses, as if the funds were his own.  [Dkt. No. 72 at 18; Dkt. No. 73 at 8 (citing Cook Test. at 111, 128; Cook Dep. at 231); Cook Test. 141, 190, 213; Cook Dep. at

---

[22] In its Reply brief, the SEC clarifies that its "Section 5 claim only involves the 4,813,109 Xytos shares Cook sold on the open-market via brokerage accounts from 2009 to 2012."  [Dkt. No. 73 at 19, n.10.]  Consequently, the two investors to whom Mr. Cook sold stock in private sales are not part of the SEC's registration claim.  [*See* Dkt. No. 72 at 34-35 (Mr. Cook's argument that the private sales are exempt from security registration requirements).]

225-26.]  Indeed, the unregistered sales of Xytos stock financed Mr. Cook's personal obligations,

including *inter alia* his home-based DirecTV, his children's tuition at St. Monica's school, and his

home swimming pool.  [Cook Dep. at 225-28.]  Although the SEC does not specifically attempt to

apply a piercing of the corporate veil theory, it is clear that its liability claim utilizes that approach.

[*See* Dkt. No. 73 at 8 ("Cook cannot hide behind the Asia Equities corporate veil for conduct that

he personally performed.").]

The Indiana Supreme Court considers the following factors in determining whether a

plaintiff is entitled to pierce the corporate veil:

> (1) undercapitalization; (2) absence of corporate records; (3) fraudulent
> representation by corporation shareholders or directors; (4) use of the corporation
> to promote fraud, injustice or illegal activities; (5) payment by the corporation of
> individual obligations; (6) commingling of assets and affairs; (7) failure to observe
> required corporate formalities; or (8) other shareholder acts or conduct ignoring,
> controlling, or manipulating the corporate form.

*Oliver v. Pinnacle Homes, Inc.*, 769 N.E.2d 1188, 1191-92 (Ind. 2002) (citing *Aronson v. Price*,

644 N.E.2d 864, 867 (Ind. 1994)).  Here, because the evidence clearly establishes that Mr. Cook

made numerous fraudulent representations, used Asia Equities to promote fraud, used Asia

Equities stock proceeds to pay for individual obligations, commingled assets by failing to observe

the corporate form, and continues to hide behind Asia Equities in an attempt to shield himself from

liability for failing to register the Asia Equities stock that he personally sold, the SEC has satisfied

in convincing fashion the requirements for piercing the corporate veil.  To establish Mr. Cook's

liability for the unregistered sale of Asia Equities stock, we hold that the SEC is entitled to pierce

the corporate veil.  Moreover, due to the default judgment against Xytos and Asia Equities, the

facts that "Xytos is Cook's alter ego" and that Asia Equities is itself an alter ego of Cook have

been established as true.  [Compl. at ¶¶ 3, 4.]

Mr. Cook also attempts to rely on the "original registration" in 1999 of the Xytos stock by Xytos's predecessor company, ISM, to defeat the SEC's registration violation claim.  [Dkt. No. 74 at 14, 33; *see also* Dkt. No. 75 (Cook's Motion to Dismiss and Motion for Summary Judgment).]  Mr. Cook's argument is not supported by applicable law.  Section 5's registration requirements apply to *transactions*, not the securities themselves.  Regardless of whether or not IMS registered the sale of those stock to Asia Equities, Mr. Cook was still required to file the necessary registration upon selling those shares.  *See* 17 C.F.R. § 230.144, prelim. note 1 ("If any person sells a . . . security to another person, the sale must be registered unless an exemption can be found for the transaction.");  *Allison*, 907 F.2d at 648 ("Section 5 . . . applies to transactions; each sale must be registered or exempt.  A violation does not stick to instruments like tar.  It is a personal offense by the seller. . . .").  Mr. Cook filed no such registrations and his argument that he didn't need to is clearly in error and thus unavailing.

Finally, Mr. Cook argues that his sale of shares to seven shareholders was exempt from registration because those investors received shares of Xytos International, Inc. stock, not Xytos, Inc. stock.  [Dkt. No. 72 at 39-40.]  According to Mr. Cook, Xytos International, Inc. is not a U.S. company and thus no registration is required.  [*Id.*]  We have discussed this theory previously.  In advancing it, Mr. Cook has confused the nature of the SEC's claim.  The SEC's registration claim under Section 5 is related to the *open market* sales, not the sales to the seven investors for $100,000.  [*See* Dkt. No. 60 at 26-28; Dkt. No. 73 at 19, n.10 ("[T]he SEC's Section 5 claim only involves the 4,813,109 Xytos shares Cook sold on the open-market via brokerage accounts from 2009 to 2012.").]  Mr. Cook's argument thus is simply irrelevant.

Mr. Cook's failure to file registration statements for the open market sales of Xytos, Inc. stock constitutes a clear violation of Sections 5(a) and 5(c) of the Securities Act.

C.      **Mr. Cook Aided and Abetted Xytos's Fraud.**

The SEC next contends that Xytos, although found to be in default in this litigation, committed securities fraud based itself on its material misrepresentations to actual and prospective investors, which violations Mr. Cook aided and abetted.  [Dkt. No. 60 at 28-29 (citing *SEC v. Kinnucan*, 9 F. Supp. 3d 370, 375 (S.D.N.Y. 2014) (finding that company president's liability for Rule 10b-5 violations was imputed to the company)).]  The Securities and Exchange Act imposes secondary liability on "any person that knowingly or recklessly provides substantial assistance to another" person or entity in violation of either Act. 15 U.S.C. §§ 77o(b), 78t(e).  "Substantial assistance, in turn, requires a showing that the aider and abettor proximately caused the harm . . . on which the primary liability is predicated." *SEC v. DiBella*, 587 F.3d 553, 566 (2d Cir. 2009) (internal quotations omitted).  To establish that Mr. Cook aided and abetted Xytos's fraud, the SEC must establish: (1) a primary violation of Section 10(b); (2) that Mr. Cook had actual knowledge of that primary violation; and (3) that Mr. Cook substantially assisted in that primary violation.  15 U.S.C. §§ 77o(b), 78t(e); *see also SEC v. Monterosso*, 768 F. Supp. 2d 1244, 1269 (S.D. Fla. 2011) ("A defendant who is not himself a primary violator, but who had knowledge of a primary violation and provides substantial assistance in it, is liable as an aider and abettor.").

Having found Mr. Cook primarily liable for securities fraud, we also hold that the SEC has presented sufficient evidence to satisfy each of the elements of aider/abettor liability as to him vis-à-vis Xytos.  Because Mr. Cook personally made the misrepresentations, he was clearly aware of Xytos's conduct and was, in truth, the proximate cause of the misrepresentations as CEO of Xytos.  Thus, he substantially assisted Xytos's primary violation.  [*See* Dkt. No. 60.]  Mr. Cook's only response to these claims is that he "could not have been an aider or abettor to Xytos, Inc. because there was NO existence of a primary violation of the Exchange Act."  [Dkt. No. 72 at 39.]  Having

found that a primary violation of the Securities and Exchange Act occurred, we reject this attempted defense by Mr. Cook.  The undisputed material facts clearly show that Mr. Cook aided and abetted Xytos's fraud.

**D.     Mr. Cook is Liable for Xytos's Fraud as a "Controlling Person."**

The SEC further seeks to impose "control person" liability on Mr. Cook for Xytos's primary violations of Section 10(b) and Section 10b-5.  Section 20(a) of the Securities and Exchange Act creates joint and several liability for "controlling persons," that is, persons who control any entity or person liable under the Act or rules thereunder.  15 U.S.C. § 78t(a).  The two-step test for establishing control requires a showing that the defendant exercised control over the primary violator's general operations, and that the "defendant possessed the power to control the specific transaction or activity upon which the primary violation is predicated." *Harrison v. Dean Witter Reynolds, Inc*., 974 F.2d 873, 877 (7th Cir. 1992).  Again, though perhaps irrelevant based on our finding of direct liability as to Mr. Cook, he was Xytos's sole officer and director, and he exercised complete control over Xytos from 2009 to 2012, including Xytos's website, press releases, and investor communications.  Consequently, Mr. Cook was a control person of Xytos. *See, e.g.*, *SEC v. Imperali*, 594 Fed. Appx. 957, 962 (11th Cir. 2014) (affirming summary judgment in favor of SEC on control-person liability where defendant was co-defendant entity's controlling shareholder and controlled corporate decisions).

Mr. Cook does not dispute that he was a control person for Xytos or that liability flows to him as a result of his control over Xytos's operations.  Accordingly, we hold that Mr. Cook is liable for securities fraud violations in his role as a control person for Xytos.

E.      **The SEC's Request for Relief.**

1.      **Permanent Injunction.**

The Securities and Exchange Act authorizes district courts to grant injunctive relief in SEC enforcement cases. 15 U.S.C. §§ 77t(b), 78u(d).  To obtain permanent injunctive relief once a violation has been demonstrated, the SEC "need only show that there is a reasonable likelihood of future violations." *SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982).  Courts must assess the totality of the circumstances in determining the likelihood of future violations, and should consider: (1) the gravity of harm caused by the offense; (2) the extent of the defendant's participation and his degree of scienter; (3) the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; (4) the defendant's recognition of his own culpability; and (5) the sincerity of his assurances against future violations. *Id.*

Injunctive relief is altogether appropriate here.  The violations that occurred in the instant case are neither minor nor first infractions by Mr. Cook.  [Dkt. No. 62-15 (State of Indiana 2009 Order Against Cook) at ¶ 6, 58.][23]  Mr. Cook continues to deny responsibility for any violations of the securities statutes, allowing no solace that there will be no future violations by him.  Mr. Cook's repeated, brazen, extensive misrepresentations weigh strongly in favor of a permanent injunction.  Indeed, according to the SEC, Mr. Cook still owns Xytos stock and maintains control of several companies (including Xytos).  A permanent injunction prohibiting him from future

---

[23] In 2009, the Securities Division of the Secretary of State of Indiana issued a final order finding that Cook, through Suisse Capital and Asia Equities, defrauded investors in Suisse Capital and sold unregistered securities from 1996 to 1999.  [Dkt. No. 62-15 at ¶¶ 6, 58.]  The order bars Mr. Cook from the securities industry in Indiana and ordered him to pay $271,200 in restitution and fines.  [*Id.* at 13.]  We have not been informed as to whether that payment was ever made.  It seems clear that the bar imposed on his involvement in the securities industry in Indiana has been disregarded by him.

50

violations of the antifraud and registration provisions of the federal securities laws is appropriate here, considering the possibility, indeed, the likelihood of future violations. *See, e.g., Shavers*, 2014 WL 4652121, at *10 (granting summary judgment in favor of the SEC and issuing permanent injunction against defendant who lied to investors on websites over 18-month period). For these same reasons, a permanent injunction directed toward Xytos and Asia Equities as corporate entities is also justified and appropriate. We note that Mr. Cook has interposed no response or other objection to the SEC's request for a permanent injunction.

### 2. Disgorgement and Prejudgment Interest.

The SEC also seeks disgorgement and an assessment of prejudgment interest from Mr. Cook, Asia Equities, and Xytos. Aside from his response to the merits of the SEC's claims discussed previously, Mr. Cook again has interposed no specific response or objection to the SEC's request for disgorgement and prejudgment interest.

"Disgorgement is a form of restitution." *SEC v. Lipson*, 278 F.3d 656, 662-63 (7th Cir. 2002). The authority of a federal court to order disgorgement in an SEC enforcement action is well-established. *See, e.g.*, *SEC v. Patel*, 61 F.3d 137, 139-40 (2d Cir. 1995); *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1229-30 (D.C. Cir. 1989). Courts have broad discretion in determining whether to order disgorgement, and in calculating the amount of disgorgement. *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474-75 (2d Cir. 1996). The amount ordered need only be a "reasonable approximation" of profits "causally connected" to the wrongdoing. *Patel*, 61 F.3d at 139. Any risk of uncertainty in calculating disgorgement falls on the defendants whose conduct created the uncertainty. *See id*. at 140.

We agree with the SEC that Mr. Cook, Xytos, and Asia Equities deserve to be required to disgorge the ill-gotten gains of their fraud, to wit, the amounts they made selling Xytos shares on

the open market and to private investors while misrepresenting the company.   No hearing is

necessary before deciding this issue because the existing record is sufficient to permit an accurate

calculation of this amount, plus prejudgment interest thereon.   *See, e.g.*, *United States v. Di Mucci*,

879 F.2d 1488, 1497 (7th Cir. 1989) (hearing on damages unnecessary if figure can be ascertained

from definite figures contained in the documentary evidence or in detailed affidavits); *Shavers*,

2014 WL 4652121, at *10-11 (ordering disgorgement without a hearing based on summary

judgment record).   Specifically, we find that the declaration of the SEC's staff accountant, Norman

Jones, supports a calculation of the amount of disgorgement and prejudgment interest, without

necessity of an evidentiary hearing.   [*See* Jones Decl.]

Courts have "wide discretion" in awarding prejudgment interest, which helps assure that

defendants do not profit from their fraud. *SEC v. Lauer*, 478 Fed. Appx. 550, 557 (11th Cir. 2012);

*see SEC v. Sargent*, 329 F.3d 34, 40 (1st Cir. 2003) ("Prejudgment interest, like disgorgement,

prevents a defendant from profiting from his securities violations.").   Prejudgment interest is

appropriate on disgorgement amounts based on the IRS underpayment rate. *SEC v. Koenig*, 532 F.

Supp. 2d 987, 995 (N.D. Ill. 2007).

We therefore order, based on the undisputed evidence and the IRS underpayment rate, that

Mr. Cook disgorge, jointly and severally with Xytos and Asia Equities, the amount of  $503,513

in profits, and $29,664 in prejudgment interest, derived from sales of Xytos shares on the open

market.   [Jones Decl. at ¶¶ 14, 18, Table A.]   It is also hereby ordered that Mr. Cook disgorge,

jointly and severally with Xytos and Asia Equities, the amounts of $100,000 in profits, and $9,651

in prejudgment interest, derived from his sales of Xytos shares to private investors.   [*Id.* ¶ 19.]   In

total, therefore, the amount Mr. Cook is hereby ordered to disgorge, jointly and severally with

Xytos and Asia Equities, is $603,513 in ill-gotten gains, plus $39,315 in prejudgment interest thereon.

### 3.    Civil Penalties.

The SEC requests that the Court also impose substantial civil penalties against Mr. Cook, Xytos, and Asia Equities.  As with the disgorgement and prejudgment interest requests by the SEC, Mr. Cook did not respond to this request for imposition of a civil penalty.

The Securities and Exchange Act authorizes district courts to award a civil penalty in SEC enforcement cases.  *See* 15 U.S.C. §§ 77t(d), 78u(d)(3).  A civil penalty serves to punish and deter wrongdoers because disgorgement "does not result in any actual economic penalty or act as financial disincentive to engage in securities fraud."  *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996) (quoting H.R. Rep. No. 101-616 (1990)).

The Securities and Exchange Act creates three penalty "tiers" based on a defendant's culpability and the extent of the harm resulting from the violation.   15 U.S.C. §§ 77t(d), 78u(d)(3).[24]  The third  (and highest) tier is reserved for conduct that (1) involves fraud, deceit, or manipulation, and (2) resulted in substantial losses (or created a risk of such losses) to others.  *Id.* §§ 78u(d)(3)(B)(iii).  For natural persons, the maximum third-tier penalty for "each such violation" during the period of Mr. Cook's violations is set at the greater of $150,000 or the "gross amount of pecuniary gain" to such person.  *Id.*; 17 C.F.R. § 201.1004.  With regard to gross pecuniary gain, "many courts have imposed a single penalty equal to the amount of disgorgement."  *See SEC v. Graulich*, 2013 WL 3146862, at *7 (D.N.J. June 19, 2013) (citing cases).   District courts

---

[24] The SEC advocates for imposition of a tier three penalty.  Tier one penalties are limited to $5,000 for a natural person or the gross amount of the pecuniary gain.  Second tier penalties are limited to $50,000 and appropriate in cases of fraud, deceit, manipulation, deliberate violations, and disregard for the rules.  *See* 15 U.S.C. § 77t(d)(2)(A) and (B).

routinely award substantial penalties in fraud and other cases.  *See, e.g., SEC v. Lyndon*, No. 13-00486, 2014 WL 3928366, at *10 (D. Haw. Aug. 11, 2014) (imposing $150,000 penalty against an individual); *SEC v. Yang*, No. 12-C-24732014 WL 2198323, at *3 (N.D. Ill. May 27, 2014) (same).

District courts have considerable discretion when setting the amount of a civil penalty.  *See SEC v. Constantin*, No. 11-cv-4642 2013 WL 1453792, at *18 (S.D.N.Y. Apr. 2, 2013).  "In determining what the penalties should be, the court should consider the seriousness of the violations, the defendant's intent, whether the violations were isolated or recurring, whether the defendant has admitted wrongdoing, the losses or risks of losses caused by the conduct, and any cooperation the defendant provided to enforcement authorities."  *SEC v. Alanar, Inc.*, No. 05-cv-1102, 2008 WL 1994854, at *19-20 (S.D. Ind. May 6, 2008) (citing cases).

The SEC requests that substantial civil penalties be imposed on Mr. Cook, Xytos, and Asia Equities.  It describes Mr. Cook's business practices as "a four-year pump-and-dump scheme in which he repeatedly and knowingly made false statements about Xytos so that he could dump his own shares at inflated prices," which resulted in Mr. Cook's gain of more than $600,000 while Xytos investors were left with worthless stock.  [Dkt. No. 60 at 33.]  We conclude that these statutory penalties should be assessed on either a per violation basis or a gross pecuniary gain basis.  We also agree with the SEC that "[a] substantial penalty is also needed to deter Cook," [*id.*]; stopping short of requesting a specific amount.  Thus, the SEC's request to impose a civil penalty is granted, and the appropriate amount of such a penalty will be determined at a subsequent hearing before the Court.

4.        **Officer/Director Bar and Penny Stock Bar.**

The Securities and Exchange Act authorizes district courts to impose officer-and-director bars on those who violate the antifraud provisions of each Act.  *See* 15 U.S.C. §§ 77t(e), 78u(d)(2). More specifically, courts can prohibit persons who violate those provisions from serving as officer or director of certain SEC-reporting and SEC-registered companies, "if the person's conduct demonstrates unfitness to serve" in such capacity.  *Id.*  The non-exclusive list of factors courts are to consider in making the "unfitness" determination include the egregiousness of the fraud and the defendant's (1) role or position during the fraud, (2) degree of scienter, (3) status as recidivist, and (4) economic stake in the violation, as well as the likelihood that misconduct will recur.  *See Patel*, 61 F.3d at 141.

The SEC asserts that Mr. Cook is "plainly unfit to server as an officer or director."  [Dkt. No. 60 at 34.]  Indeed, the evidence demonstrates that Mr. Cook is a recidivist whose longstanding pattern of behavior is to knowingly commit fraud as the CEO and lone director of Xytos.  Mr. Cook personally profited in substantial amounts from his misrepresentations.  The SEC asks that the Court impose a permanent officer-and-director bar against Cook.  *Cf. SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1193-94 (9th Cir. 1998) (affirming permanent bar where defendant was recidivist who committed knowing fraud in corporate capacity).  Mr. Cook did not respond to this request.  We grant the SEC's request and hereby impose a permanent officer-and-director bar against Mr. Cook, based on the foregoing extensive proof of his knowing and intentional role in the ongoing fraud and related offenses.

The Securities and Exchange Act also authorizes district courts to impose a penny-stock bar "against any person participating in, or, at the time of the alleged misconduct, who was participating in, an offering of penny stock."  15 U.S.C. §§ 77t(g), 78u(d)(6).  A "penny stock" is

an equity security bearing a price of less than five dollars except as provided in 17 C.F.R. § 240.3a51-1.  The SEC represents that the Xytos stock meets the definition of "penny stock" under those provisions [Dkt. No. 60 at 34-35], and Mr. Cook again offers no response.  We hold that Mr. Cook was a "person participating in an offering of penny stock" when he offered and sold Xytos stock to investors in private placements.  *See id.* §§ 77t(g)(2), 78u(d)(6)(B).

The standard for imposing a penny stock bar "essentially mirrors that for imposing an officer-or-director bar."  *SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007).  For the reasons cited above, to protect future investors, we grant the SEC's request to permanently bar Cook from participating in any penny-stock offerings.  *Cf. SEC v. Boock*, No. 09-cv-8261, 2012 WL 3133638, at *2-3 (S.D.N.Y. Aug. 2, 2012) (imposing penny-stock bar where defendant profited from fraud by selling shares at inflated prices).

## CONCLUSION

For all of the above reasons, we GRANT the SEC's Motion for Summary Judgment [Dkt. No. 59], we GRANT the SEC's application for default judgment [Dkt. No. 63], and we DENY Mr. Cook's Motion to Dismiss and for Summary Judgment [Dkt. No. 75].  Specifically, we rule as follows:

A. Defendant Timothy E. Cook and Defendant Xytos, Inc. are permanently restrained and enjoined from violating, directly or indirectly, Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security to employ any device, scheme, or artifice to defraud; to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or to engage in any

act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

B.    Defendant Timothy E. Cook and Defendant Xytos, Inc. are permanently restrained and enjoined from violating Section 17(a) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)] in the offer or sale of any security by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly to employ any device, scheme, or artifice to defraud; to obtain money or property by means of any untrue statement of a material fact or any omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

C.    Defendant Timothy E. Cook and Defendant Asia Equities, Inc. are permanently restrained and enjoined from violating Section 5 of the Securities Act [15 U.S.C. § 77e] by, directly or indirectly, in the absence of any applicable exemption:

·      Unless a registration statement is in effect as to a security, making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise;

·      Unless a registration statement is in effect as to a security, carrying or causing to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; or

·      Making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed with the Commission as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act [15 U.S.C. § 77h].

D.    Pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)], Defendant Timothy E. Cook

is permanently prohibited from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

E.      Defendant Timothy E. Cook is permanently barred from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.  A penny stock is any equity security that has a price of less than five dollars, except as provided in Rule 3a51-1 under the Exchange Act [17 C.F.R. § 240.3a5 1-l].

F.      Defendant Timothy E. Cook, Defendant Xytos, Inc., and Defendant Asia Equities, Inc. are jointly and severally liable for disgorgement of $603,513, representing profits gained as a result of the conduct alleged in the Complaint and found by the Court in this summary judgment, together with prejudgment interest thereon in the amount of $39,315.

G.      Pursuant to Section 2l(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] and Section 20(d)(2) of the Securities Act [15 U.S.C. § 77t(d)(2)], Defendants Timothy E. Cook, Xytos, and Asia Equities are liable for a civil penalty **in an amount to be determined at a future court hearing**.  Defendants shall pay $642,828, plus each Defendant's respective civil penalty also to be determined at a future court hearing, to the Securities and Exchange Commission within 14 days after entry of Final Judgment.

H.      Defendants may satisfy their obligations pursuant to paragraphs F and G, above, by transmitting payment electronically to the Commission, which will provide detailed ACH Transfer/Fedwire instructions upon request.  Payment(s) may also be made directly from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm.  Defendants may also pay by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission, which shall be delivered or mailed to

Enterprise Services Center Accounts Receivable Branch
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

and shall be accompanied by a letter identifying the case title, civil action number, and name of this Court; Timothy E. Cook, Xytos, Inc., or Asia Equities, Inc. defendants in this action; and specifying that payment is made pursuant to this Order.

Defendants shall simultaneously transmit photocopies of evidence of payment and case identifying information to the Commission's counsel in this action. By making this payment, Defendants relinquish all legal and equitable right, title, and interest in such funds and no part of the funds shall be returned to Defendants. The Commission shall send the funds paid pursuant to this Order to the United States Treasury.

The Commission may enforce the Court's judgment for disgorgement and prejudgment interest by moving for civil contempt (and/or through other collection procedures authorized by law) at any time after 14 days following entry of Final Judgment. Defendants shall pay post judgment interest on any delinquent amounts pursuant to 28 U.S.C . § 1961.

I.      The SEC is directed to file in this cause a certification that the payment imposed by this judgment have been fully satisfied by Defendants, when that occurs.

J.      This Court shall retain jurisdiction of this matter for the purposes of enforcing the terms of this Order.

Final judgment shall be entered after the hearing to determine the amount of civil penalties owed by Defendants Cook, Asia Equities, and Xytos.

Date:    8/24/2015

_Sarah Evans Barker_
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

ASIA EQUITIES, INC.
2015 West 96th Street
Indianapolis, IN 46260

XYTOS, INC.
2015 West 96th Street
Indianapolis, IN 46260

TIMOTHY EDWARD COOK
2015 West 96th Street
Indianapolis, IN 46260

Carl F. Schoeppl
SCHOEPPL & BURKE, PA
carl@schoepplburke.com

John E. Birkenheier
SECURITIES AND EXCHANGE COMMISSION
birkenheierj@sec.gov

Eric M. Phillips
U.S. SECURITIES AND EXCHANGE COMMISSION - Chicago
phillipse@sec.gov

Nicholas J. Eichenseer
U.S. SECURITIES AND EXCHANGE COMMISSION - Chicago
eichenseerN@sec.gov